LAH, Trustee, Appellee,

v.

ROGERS, Appellant, et al.

[Cite as *Lah v. Rogers* (1998), 125 Ohio App.3d 164.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 96–L–071.

Decided Jan. 2, 1998.

*Gregory J. O'Brien*, for appellee.

*Greene & Tulley Co., L.P.A., Joseph P. Tulley* and *Patrick J. Tulley*, for appellant.

---

CHRISTLEY, Judge.

This appeal is taken from a final judgment of the Lake County Court of Common Pleas. Appellant, Antonia Derling Rogers, appeals from the trial court's decision upholding the validity of a trust agreement and subsequent amendments in an action for a declaratory judgment brought by appellee, Andrej N. Lah.

The trust in question was created by Mary Derling ("Derling"). Derling was born in Slovenia, but had lived in the United States since the 1950s. Derling gave birth to two daughters, appellant and Marie Lah ("Marie"). At the time of the dispute, appellant had two minor sons, Jayson and Nicholas Rogers.[1] Marie, meanwhile, had three adult children: appellee, Maria Lah–Cobb ("Maria"), and Kristina Lah ("Kristina"). Both appellee and Kristina are attorneys at law.

In February 1992, Derling was diagnosed with colon cancer. Given a poor prognosis by her doctors, Derling executed a revocable, *inter vivos* trust instrument on April 30, 1992 in order to avoid having her estate pass through probate. This document was drafted by attorney Charles Driggs, an experienced lawyer who had practiced in the area of trusts and estates for thirty years.

In order to fund the trust, Derling executed quitclaim deeds on two parcels of land. One tract was located at 19801 Shawnee Avenue in Cleveland, Ohio, and it contained land and a house. The other deed was for a sixty-acre farm, including a house and various farm buildings, located at 7442 Warner Road in Madison, Ohio. Although he is an attorney, appellee did not participate in the drafting of the initial trust agreement. He was, however, named as the trustee by Derling.

---

**1.** Initially, the sons appealed the reduction of their share of the trust. However, this appeal was voluntarily dismissed.

The trust agreement basically provided that upon Derling's death, appellee, in his capacity as trustee, was to distribute an undivided one-half interest in the real property and all other trust assets to Derling's two daughters in a per stirpes fashion.

At the time the trust was created, Derling, a widow, lived on the Madison farm with appellant and her two sons. Marie, meanwhile, lived in the house on the Cleveland property.

By the fall of 1993, Derling's condition had worsened. She contacted appellee about altering the terms of her trust. Derling was apparently concerned that her two daughters, Marie and appellant, would sell the real property in the trust after her death, thereby frustrating her ultimate wish to have the property pass to her five grandchildren. In addition, Derling became aware that Marie was experiencing serious financial difficulties and that Marie's creditors might foreclose on her share of the property after it passed through the trust upon Derling's death.

As a result of these concerns, Derling requested that appellee prepare an amendment to the trust instrument. Specifically, Derling wanted to change Article IV of the agreement to remove appellant and Marie as remainder persons and instead grant life estates to them in the two parcels of land. Then, after the life estates had terminated with the deaths of appellant and Marie, the property would pass per stirpes to the five grandchildren. Appellee drafted the amendment as requested by Derling, and she signed the document on December 16, 1993 in the presence of two witnesses and a notary public.

In the spring of 1994, Derling contacted appellee once again about the trust. She was apprehensive that her daughters might still somehow encumber their life estates in the property. Derling, therefore, decided to revoke the prior amendment and replace it with language granting appellant and Marie a conditional life estate in the land held in the trust.[2] The life estate was conditioned upon the paying of all expenses associated with the property, including taxes, insurance, and general maintenance. Also, this amendment mandated that any attempted transfer, conveyance, or assignment would result in the immediate termination of the interest in the land held by the daughter making such attempt. Through his powers as trustee, appellee was accorded the sole discretion to determine whether appellant and Marie satisfied the conditions imposed by the latest amendment to the trust agreement.

---

2. The trial court described this amendment as granting the daughters a "conditional life estate" in its opinion and judgment entry, whereas the parties to this appeal refer to it as a "tenancy at will." For purposes of this appeal, it is not important what nomenclature is used to label the estate in land that was given to Derling's daughters.

The remainder interest was again granted to the five grandchildren, but the distribution was changed from per stirpes to per capita. This had the legal effect of reducing the respective shares of Jayson and Nicholas Rogers from one-fourth to one-fifth, while increasing the interests of appellee and his two sisters from one-sixth to one-fifth. As with the previous amendment, appellee drafted its text and submitted it to Derling for review. Derling signed the amendment on July 27, 1994 in front of two disinterested witnesses, and the document was properly notarized.

After this amendment, no further changes were made to the trust agreement by Derling. Her health continued to deteriorate, and she subsequently died on December 4, 1994. Immediately following Derling's burial, acrimony arose among her surviving family members regarding the terms of the trust.

Consequently, appellee filed an action for a declaratory judgment in the trial court on December 18, 1994. The action was filed pursuant to R.C. 2721.05.[3] The purpose of the litigation was to obtain a declaratory judgment of the trial court with respect to the rights of the beneficiaries and the powers of the trustee under the terms of the trust. Appellee's original complaint named appellant, Jayson and Nicholas Rogers, Maria, and Kristina as defendants.[4]

Appellant filed an answer and counterclaim, which was later amended, on February 9, 1995. In her counterclaim, she sought an order of the trial court declaring the original trust instrument and the July 27, 1994 amendment thereto null and void on the grounds of lack of testamentary capacity, undue influence, breach of fiduciary duty, and a lack of meeting of the minds.

The trial court appointed a guardian *ad litem* to represent the interests of Jayson and Nicholas Rogers in the litigation. Meanwhile, Kristina, an attorney, represented herself and her sister, Maria.

The trial court conducted a bench trial beginning in late December 1995 and concluding in early January 1996. Numerous witnesses were called to testify during the course of the trial. After taking the matter under advisement for several months, the trial court issued an opinion and judgment entry on April 15,

---

**3.** R.C. 2721.05 provides in pertinent part:

"Any person interested as or through an executor, administrator, *trustee*, guardian, or other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust, in the administration of a trust, or of the estate of a decedent, an infant, lunatic, or insolvent, may have a declaration of rights or legal relations in respect thereto in any of the following cases:
" * * *

"(C) *To determine any question arising in the administration of the estate or trust,* including questions of construction of wills and other writings." (Emphasis added.)

**4.** Although they were named as defendants, Maria and Kristina appeared at trial in support of the trust provisions and subsequent amendments.

1996. It ruled that Derling had the testamentary capacity to make the challenged disposition of her real and personal property, that appellee had not exerted undue influence over Derling, that appellee had not breached his fiduciary duty as trustee, and that Derling had intended to dispose of her assets in the manner reflected by the trust agreement and its accompanying amendments. Therefore, the trial court decreed the following: (1) the trust agreement as executed on April 30, 1992 and later amended on July 27, 1994 was a valid, binding, and enforceable instrument whose terms governed the rights of the beneficiaries and the powers of the trustee; (2) the amendment of December 16, 1993 was superseded by the amendment of July 27, 1994; and (3) the counterclaim filed against appellee was not supported by the evidence and was accordingly dismissed.

From this judgment, appellant filed a timely appeal with this court, in which she asserts four assignments of error:

"[1.] The trial court erred to the prejudice of defendant-appellant, Antonia Derling Rogers, in finding that there was a meeting of the minds of Mary Derling, as grantor and plaintiff-appellee, as trustee, with respect to the trust instrument of April 30, 1992, and the amendment instrument of July 27, 1994, which finding was not supported by the weight of the evidence.

"[2.] The trial court erred to the prejudice of defendant-appellant, Antonia Derling Rogers, in finding that plaintiff-appellee had rebutted the presumption of undue influence which had arisen, with respect to the amendment instrument of December 16, 1993 and the amendment instrument of July 27, 1994, which finding was not supported by the weight of the evidence.

"[3.] The trial court erred to the prejudice of defendant-appellant, Antonia Derling Rogers, in finding that Mary Derling had testamentary capacity in executing the documents dated April 30, 1992 and July 27, 1994, which finding was overcome by clear and convincing evidence by defendant-appellant.

"[4.] The trial court erred to the prejudice of defendant-appellant, Antonia D. Rogers, in not applying the controlling law to the situation where the opposing party's consent to a contractual provision is obtained by the wrongdoing of the opposing party."

In her first assignment of error, appellant contends that there was no "meeting of the minds" between Derling, as grantor, and appellee, as trustee, with respect to the trust instrument and the July 27, 1994 amendment. According to appellant, in every trust agreement, there are two contracting parties who are mutually bound by contractual obligations. In short, appellant argues that the law of contracts governs trusts, and the contract law theory of no "meeting of the minds" should apply in the instant case to invalidate the trust agreement and

subsequent amendment. After stating this proposition in her brief, appellant went on to argue that Derling did not comprehend the terms of her trust and its corresponding legal ramifications.

Upon review, we cannot agree with appellant's argument. The document executed by Derling on April 30, 1992 was not a traditional bilateral contract between Derling and appellee. Rather, it was a trust instrument reflecting Derling's unilateral decision as the settlor to place her assets into a revocable, *inter vivos* trust to be administered by appellee as the trustee for the benefit of Derling and her two daughters. Appellant neither demonstrated that the elements of a contract were present in the creation of this trust nor presented any authority which would comport with the facts of this situation in establishing that a contract existed. Therefore, appellant's invocation of the contract law theory of no "meeting of the minds" is inapposite as applied to the original trust document. As such, appellant's first assignment lacks merit.

In her second assignment of error, appellant posits that the trial court erred by finding that appellee had rebutted a presumption of undue influence that had arisen in the context of both the December 16, 1993 and July 27, 1994 amendments. The crux of this argument is that appellee exerted undue influence over Derling in drafting the two amendments which established his beneficial interest in the property.

The elements of undue influence include the following: (1) a susceptible party; (2) another's opportunity to exert influence; (3) the fact of improper influence exerted or attempted; and (4) the result showing the effect of such improper influence. *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 65, 567 N.E.2d 1291, 1298; *West v. Henry* (1962), 173 Ohio St. 498, 510–511, 20 O.O.2d 119, 125–126, 184 N.E.2d 200, 207–208. In addition, the phrase "undue influence" suggests a two-step inquiry. First, it must be ascertained whether the transaction was the result of influence brought to bear upon the susceptible party. Second, it must be determined whether that influence was actually "undue." Not every exertion of influence will nullify a given transaction. *Krischbaum* at 68, 567 N.E.2d at 1300–1301.

When analyzing whether the influence brought to bear on the susceptible party was undue, the focus must be on whether the influence was reasonable under the circumstances. In this regard, the Supreme Court of Ohio has recognized that the role of an attorney is particularly susceptible to the exercise of undue influence. *Id.* at 68–69, 567 N.E.2d at 1300–1302.

In the case *sub judice*, the trial court found that a rebuttable presumption of undue influence did not arise with regard to the trust agreement itself because appellee was not involved in its drafting. The trial court, however, found such a

rebuttable presumption of undue influence with respect to the two amendments because appellee was a close family member of Derling's who served as her attorney in drafting the amendments.

As its authority for imposing this rebuttable presumption of undue influence on appellee, the trial court relied in part on *Krischbaum*. In *Krischbaum*, the Supreme Court of Ohio held:

" * * * [A] presumption of undue influence, rebuttable by a preponderance of the evidence, arises when:

"(1) the relationship of attorney and client exists between a testator and an attorney,

"(2) the attorney is named as a beneficiary in the will,

"(3) the attorney/beneficiary is not related by blood or marriage to the testator, and

"(4) the attorney/beneficiary actively participates in the preparation of the will." *Id.*, 58 Ohio St.3d at 63, 567 N.E.2d at 1297.

In addition to relying on *Krischbaum*, the trial court cited our decision in *In the Matter of Guardianship of Blumetti* (Jan. 14, 1994), Trumbull App. No. 92–T–4752, unreported, 1994 WL 45250. We held in *Blumetti* that where a confidential or fiduciary relationship exists between a donor and donee in a gift case, the transfer is looked at with some suspicion that undue influence may have been brought to bear on the donor. In such gift cases, "a presumption of undue influence arises and the burden of going forward with evidence shifts to the donee to show that his conduct was free of undue influence or fraud and that the donor acted voluntarily and with a full understanding of his act and its consequences." *Id.* at 3. The donee may then rebut the presumption of undue influence by a preponderance of the evidence. *Id.*

While *Krischbaum* was a will contest and *Blumetti* was a gift case, the holdings are still instructive in the context of trust agreements. Although not formed as a cross-assignment or cross-appeal, appellee contends that the trial court erroneously imposed a rebuttable presumption of undue influence on him because of the alleged *Krischbaum* requirement that the attorney/beneficiary not be related by blood or marriage to the susceptible party.

According to appellee, the *Krischbaum* court implicitly held that a presumption of undue influence does not arise in the context of testamentary instruments when the attorney who assisted in the drafting process is related by blood or marriage to the decedent. If so, then the trial court should not have imposed an initial duty on appellee to rebut a presumption of undue influence by a preponderance of the evidence, but rather should have placed on appellant the burden to

come forward with clear and convincing evidence that appellee obtained his beneficial interest in the trust corpus through undue influence. Appellee's logic underlying this conclusion in the present case is that although appellee is an attorney, he was also Derling's grandchild. From appellee's perspective, the blood relationship that existed between himself and Derling functioned to prevent the trial court from imposing the rebuttable presumption on him.

■ Upon reviewing *Krischbaum*, we agree that its holding is limited to situations where the attorney/beneficiary is not related to the susceptible party through consanguinity or matrimony. See, *e.g.*, *Rogers v. Frayer* (June 16, 1995), Geauga App. No. 94–G–1854, unreported, at 4, 1995 WL 408196 (noting that *Krischbaum* was not applicable because, among other things, the defendant was related to the decedent by marriage). The issue in *Krischbaum* was whether a rebuttable presumption of undue influence should arise whenever an attorney, *unrelated to a testator by blood or marriage*, prepares a will in which he or she is named as a beneficiary. Thus, the trial court should not have imposed the initial burden on appellee to rebut the presumption of undue influence by a preponderance of the evidence.[5]

As noted earlier, the trial court, nevertheless, found that a rebuttable presumption of undue influence did not arise with regard to the trust agreement because appellee was not involved in its drafting, but that the presumption did arise with respect to the two amendments to the original trust instrument. Based on our previous discussion, the trial court improperly imposed this initial burden on appellee. However, the trial court subsequently found that appellee rebutted the presumption. Clearly, appellee was not prejudiced, as the trial court found that he met the initial burden.

■ It was appellant who had to show by clear and convincing evidence that appellee exerted improper influence over Derling. Upon reviewing the evidence adduced at trial, we conclude that appellant did not meet this burden. Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be

---

5. Curiously enough, the trial court recognized the limited holding of *Krischbaum* at another point in its judgment entry. In support of her counterclaim relating to the alleged breach of fiduciary duty, appellant cited *Krischbaum* for its holding on EC 5–5 of Ohio's Code of Professional Responsibility. That provision provides in part: "Unless the client is related by blood or marriage, a lawyer *should insist that an instrument in which the lawyer's client* desires to name the lawyer beneficially be prepared by another lawyer selected by the client." The *Krischbaum* court held that the norms of behavior expressed in the Code of Professional Responsibility are directly relevant to the issue of whether an attorney brought undue influence to bear upon a susceptible party. In the case at bar, the trial court ruled that *Krischbaum* was inapplicable to the alleged breach of fiduciary duty because *Krischbaum* applies only when the attorney/beneficiary is not related by blood or marriage to the settlor.

established. *Lauerman v. Destocki* (1993), 87 Ohio App.3d 657, 667, 622 N.E.2d 1122, 1128–1129; *Kaforey v. Burge* (May 10, 1995), Summit App. No. 17050, unreported, at 2, 1995 WL 283774.

Thus, appellant had to prove that Derling was a susceptible party, that appellee had the opportunity to exert influence, that appellee attempted to influence Derling improperly, and the result showing the effect of such improper influence. In its written opinion, the trial court included a cogent analysis of the claim of undue influence:

"First of all, defendants failed to show that Derling was a susceptible party. As discussed earlier, while Derling suffered periods of confusion, these periods were temporary and she continued to be a strong willed, opinionated woman. * * * What is striking is that despite her infirmities and the pressure from her daughters, she remained constant in her desire that her properties pass essentially intact to her grandchildren.

"Second, defendants failed to show that Andrej Lah had the opportunity to influence Derling. While Andrej Lah had access to Derling, his access was quite limited in comparison to the daughters. Derling received the majority of her care from Antonia Rogers and her two grandsons who shared Derling's home in Madison, Ohio. * * *

"Third, defendants failed to show the actual or attempted imposition of improper influence. The evidence shows that Derling initiated the amendments by contacting Andrej Lah. There is no evidence tending to show that Derling was coerced either by threats or solicitations or by mercenary kindness or attentions by Andrej Lah. * * *

"Finally, defendants failed to show the result of undue influence. The evidence shows that Derling acted based upon a real concern that [her] daughters, particularly Marie Lah, would alienate the family property. * * *"

The question of whether a judgment in a civil trial is against the weight of the evidence is a factual issue. As such, an appellate court must simply determine whether there was sufficient evidence to support the judgment. Judgments supported by some competent, credible evidence will not be reversed upon review as being against the weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. A review of the record indicates that appellee did offer sufficient evidence to disprove the assumption that he used his fiduciary relationship with Derling to gain an undue advantage. Although the trial court incorrectly imposed the initial burden on appellee of rebutting a presumption of undue influence by a preponderance of evidence, it went on to correctly determine that appellant had failed to prove undue influence by clear and convincing evidence.

Thus, the initial error was not prejudicial. Although there was conflicting evidence, it was the prerogative of the trial court to assess and determine the credibility of the witnesses. As a result, appellant's second assignment is without merit.

In her third assignment of error, appellant maintains that the trial court erred by finding that she failed to prove that Derling lacked the testamentary capacity to execute the trust agreement and subsequent amendments.[6] She asserts that the trial court ignored evidence that tended to support her position that Derling lacked testamentary capacity.[7]

The analysis to be followed by courts when determining questions of testamentary capacity was set forth by the Supreme Court of Ohio in *Niemes v. Niemes* (1917), 97 Ohio St. 145, 119 N.E. 503:

"Testamentary capacity exists when the testator has sufficient mind and memory: First, to understand the nature of the business in which he is engaged; second, to comprehend generally the nature and extent of his property; third, to hold in his mind the names and identity of those who have natural claims upon his bounty; fourth, to be able to appreciate his relation to the members of his family." *Niemes* at paragraph four of the syllabus; see, also, *Bland v. Graves* (1993), 85 Ohio App.3d 644, 652, 620 N.E.2d 920, 924–925.

The party seeking to void a legal document due to a lack of capacity has the burden of proof by clear and convincing evidence. Again, clear and convincing evidence is that "proof which results in reasonable certainty of the truth of the ultimate fact in controversy." Black's Law Dictionary (6 Ed.1990) 251.

In support of her proposition that Derling lacked the testamentary capacity to execute the trust agreement and its amendments, appellant relies heavily on the deposition testimony of Dr. Mark Komar ("Dr. Komar"). Dr. Komar was Derling's primary care physician from the 1980s until her death in 1994. As a result, he had semi-regular contact over the years with Derling in his office. He essentially testified that with the advancing condition of her cancer in 1993 and 1994, Derling suffered from progressive dementia that was character-

---

6. Although her assignment is phrased to suggest that Derling lacked testamentary capacity as far back as April 30, 1992 when the original trust instrument was signed and notarized, appellant's argument in her brief focuses primarily on the several months immediately before and after the July 27, 1994 amendment. Thus, we will likewise restrict our consideration to this time frame.

7. "Testamentary capacity" is a term of art that is generally used in the context of will contests. However, the concept of a person's basic capacity to execute a legal document is equally instructive in the area of trusts. Thus, we will apply the relevant test for testamentary capacity to the case at bar, even though it did not involve a will.

ized by intermittent intervals of confusion followed by periods of lucidity. While he could not say with certainty that Derling was incompetent, Dr. Komar did testify that it was his opinion that Derling was sporadically disoriented and "was not capable of carrying out the functions of daily living, both physically and mentally in a safe and competent manner" by the time the second amendment to the trust instrument was executed on July 27, 1994.

In addition to the deposition of Dr. Komar, appellant also points to the testimony of herself and other family members to support her assertion that Derling lacked the testamentary capacity to understand the ramifications of the July 27, 1994 amendment. Appellant testified at trial that in the last year of her life, Derling became more and more disoriented regarding her surroundings and sometimes thought she was back in the Europe of her childhood. Nicholas Rogers also testified that oftentimes Derling would mistakenly think he was someone else.

Appellee, however, also called various witnesses to the stand during the course of the trial to give testimonial evidence concerning Derling's mental state. Included among these witnesses were Derling's oncologist, a hospice care worker who had weekly contact with Derling, two priests who visited Derling regularly from her diagnosis in 1992 until her death in 1994, and assorted friends of Derling. All of these witnesses testified that Derling was lucid and spoke coherently about her physical condition and her relationship with various family members.

In its written opinion, the trial court addressed appellant's claim that Derling lacked testamentary capacity:

"The Court also notes that at this point [July 27, 1994], Dr. Komar had not seen Derling for almost a year but was consulting with her care givers over the telephone. His lack of face to face contact with Derling weaken[s] the basis for his opinion that Derling was incompetent. While Derling suffered episodes of confusion, they were not lengthy and were corrected by changes in her care and treatment. None of the visiting nurses, care givers, friends or clergymen found her to be incoherent, irrational or confused. Her episodes of depression and despair when considered in view of her considerable physical discomfort and impending death, cannot be considered abnormal and [are] not evidence of incompetence."

In light of all the evidence introduced at trial, we conclude that appellant failed to prove a lack of testamentary capacity by clear and convincing evidence. There was ample evidence adduced at the hearing to demonstrate that Derling understood the nature of how she was amending her trust instrument, comprehended the extent of her property in the trust, held in her mind the names and identity of those who might have a natural claim upon the beneficial interests flowing from

the trust, and appreciated where she stood in relation to her family. Indeed, it was almost uncontroverted that Derling's ultimate desire was for her daughters to live out their lives on the Cleveland and Madison properties and then have the land pass intact to her five grandchildren. The two amendments to the original trust agreement were the means to achieve that end. Upon reviewing the record, therefore, we determine that there was competent, credible evidence to support the trial court's judgment on the issue of Derling's testamentary capacity. As previously mentioned, assessment of witness credibility was within the prerogative of the trial court. Hence, appellant's third assignment is not well founded.

In her fourth and final assignment of error, appellant proposes that the trial court erred by failing to apply common-law contract doctrine to find that Derling's consent to the July 27, 1994 amendment was induced by the wrongful advice of appellee. Again, in this assignment, appellant insists that the document by which the July 27, 1994 amendment was executed amounted to a bilateral contract between Derling and appellee. By doing so, she can then put forth a sort of "fraud in the inducement" theory as to why the July 27, 1994 amendment should be struck down.

As previously explained, we do not agree that the document expressing the July 27, 1994 amendment constituted a contract between Derling and appellee. It was simply an amendment to the text of the trust instrument. The fact that both Derling and appellee signed it in their respective positions as grantor and trustee did not make it a contract.

Having said this, we will briefly address the claim that appellee wrongfully induced Derling into amending the trust. Appellant's basic contention appears to be that appellee misled Derling into thinking that her daughters could still sell the property in the trust outright after the December 16, 1993 amendment changed their beneficial interest from that of a remainder to life estates. In support of this assertion, appellant points to various excerpts from appellee's testimony at trial such as this:

"Q. And isn't it true that you told her that the holder of a life estate, such as she's already created by the December 16th, 1993 amendment could, in fact, sell the property?

"A. Yes."

From this, appellant asks this court to glean that appellee wrongfully advised his grandmother that her daughters could sell the entire property outright (*i.e.*, a fee simple), rather than being limited to selling their actual beneficial interest in the wake of the December 16, 1993 amendment (*i.e.*, a life estate). Obviously, it is a basic principle of property law that an individual cannot sell an estate in land that is greater than the estate actually possessed by

that individual. There is no evidence to suggest, however, that appellee ever told Derling that her daughters could still sell the property in fee simple even after the December 16, 1993 amendment granted them life estates. The word "property" is ambiguous enough to encompass a fee simple estate and a life estate. As did the trial court, we decline to interpret appellee's testimony that he told his grandmother that the holder of a life estate can "sell the property" as being tantamount to telling his grandmother that the holder could convey the entire estate in fee simple. Any other interpretation would be inconsistent with the almost overwhelming evidence which indicates that Derling did *not* want her two daughters to be able to dispose of or encumber the properties. Consequently, appellant's fourth assignment is meritless.

Based on the foregoing analysis, we hold that none of appellant's four assignments of error is well taken. Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

FORD, P.J., and NADER, J., concur.