OPINION
Betty Diamond is appealing the judgment of the Montgomery County Common Pleas Probate Court finding against Betty Diamond's will contest action.
Betty Diamond and her husband were backyard neighbors with Norma Jacob and her husband. In 1977, Mrs. Jacob's husband died leaving Mrs. Jacob alone. Over the next several years, the Diamonds continued to look after Mrs. Jacob and grew in their friendship. Mrs. Jacob increasingly called upon the Diamonds for things like help with her car, problems with her furnace, fire detector, clocks or the television. Additionally, Mr. Diamond occasionally trimmed shrubs and cleaned Mrs. Jacob's patio. Also, the Diamonds began taking dinner to Mrs. Jacob because she had a drinking problem and was not eating well. Additionally, Mrs. Diamond saved Mrs. Jacob from her house when it caught on fire in 1992. Moreover since the late 1980's, Mr. Diamond drove Mrs. Jacob several times to her doctor for treatment for her eyes as a result of macular degeneration. As a result of the decline in Mrs. Jacob's vision, Mrs. Jacob lost her driver's license and the Diamonds increasingly began helping Mrs. Jacob with everyday tasks. The Diamonds began taking Mrs. Jacob to the grocery store, veterinarian, the bank, the hairdresser, in addition to taking her to her doctor appointments. Moreover, Mrs. Diamond began balancing Mrs. Jacob's checkbook each month and Mr. Diamond continued to do yard work and maintenance around the house.
As Mrs. Jacob increased in age, she acquired multiple ailments including: legal blindness, chronic shortness of breath, difficulty hearing, difficulty walking, congestive heart failure, hypoglycemia, anxiety, and anemia. In 1995, Norma's shortness of breath required her to receive continuous oxygen treatment. Moreover, Mrs. Jacob had several breathing treatments for acute attacks. Mrs. Diamond began doing Mrs. Jacob's grocery shopping and banking on her own. In March 1999, Mrs. Jacob was hospitalized for a week due to severe breathing difficulty. Mrs. Jacob returned home on April 2, 1999. From this point on Mrs. Jacob needed twenty-four hour care, seven days a week. Due to her own health concerns, Mrs. Diamond could not provide around the clock care for Mrs. Jacob.
Beginning on April 17, 1999, Mrs. Diamond hired Bennie Creager to care for Mrs. Jacob until her demise in September of 1999. Mrs. Creager and other members of her family care for elderly individuals who do not wish to go to a nursing home. Mrs. Creager cared for Mrs. Jacob for twelve hour weeknight shifts while her cousin Kimberly Hammond cared for Mrs. Jacob for twelve hour weekday shifts. (Tr. 281-283, 314-15). Additional caregivers stayed with Mrs. Jacob on the weekends and for vacations for Ms. Creager and Ms. Hammond. Ms. Creager and Ms. Hammond moved beyond their hired tasks. The caretakers assumed the role of house cleaner because they were not satisfied with the regular cleaner. (Tr. 295-296, 380). The caretakers also fired the neighbor who regularly mowed the lawn and began taking over that duty as well. (Tr. 294-295, 525-528). The caretakers contacted Mrs. Jacob's doctor regarding Mrs. Jacob's use of inhalers and alcohol. (Tr. 188, 189, 291-292, 297-298, 312-313). Additionally, the caretakers bought new bedding, sheets, and pillows for the house for which Mrs. Jacob paid. (Tr. 296). Since Mrs. Jacob was blind, the caretakers would write out the check for either their payment or for whatever purchases they had made on Mrs. Jacob's behalf and then they would place a guide over the check which would allow Mrs. Jacob to sign the check. (Tr. 50, 334, 366).
In September of 1999, Mrs. Creager contacted an attorney who agreed to meet with Mrs. Jacob in order to draft a new will. (Tr. 468-469). On September 10, 1999, the attorney met with Mrs. Jacob while Ms. Creager and Ms. Hammond were in and out of the room. (Tr. 326, 469). The attorney asked Mrs. Jacob a few basic questions to see if she was of sound mind. (Tr. 472-474). On September 14, 1999, a new will was created in the presence of the attorney, a witness, Ms. Creager, and Ms. Hammond. (Tr. 481). On September 29, 1999, Ms. Jacob died. This new will had several specific bequests to four of Mrs. Jacob's nieces as the previous will did, but in the new will the residuary of the estate was going to Ms. Creager and Ms. Hammond rather than the Diamonds as in the previous will. On September 30, 1999, Ms. Creager filed Ms. Jacob's will in the Montgomery County probate court.
Mrs. Diamond filed a complaint contesting the will in April of 2000 and a jury trial was held. Counsel for the Diamonds proposed the following jury instructions to be inserted following the elements of Undue Influence:
 1. For purposes of determining the element of opportunity to exert undue influence, the relationship of the Decedent to the person who is alleged to have exerted undue influence at the time Decedent executed the Will is important. A person in a relationship of trust or confidence has more opportunity to exert undue influence than does a mere acquaintance.
 2. Where a confidential relationship exists between a testator and a beneficiary, gift giving will is looked upon with some suspicion that undue influence may have been brought to bear on the testator by the beneficiary.
 3. If you find that a confidential relationship did exist between Norma Jacob and Bennie Creager and/or Kimberly Hammond, you may infer the fact of undue influence on the part of Bennie Creager and Kimberly Hammond, and the burden of proof shifts to the defendants to prove that their conduct was free from undue influence, and that Norma Jacob acted voluntarily and with a full understanding of her act and its consequences, by a preponderance of the evidence.
 4. Confidential or fiduciary relationship is one in which special confidence and trust is placed in the integrity and fidelity of another, who acquires a resulting position of superiority or influence by virtue of this special trust. Such a relationship can be created through a formal processes, such as the grant of power of attorney, or by informal means, such as allowing another to care for personal matters of finance or health.
(Tr. 563). The trial court refused to give the requested instructions and instead gave the standard instruction out of the Ohio Jury Instructions. (Tr. 561-575); 3 Ohio Jury Instructions (2001), Section 363.01-.07. On March 23, 2001, the matter was placed before the jury. During the course of deliberations, the jury sent a note to the trial court asking for the four qualifications that determine undue influence. The trial court returned a typewritten note containing the elements of undue influence. The jury returned a verdict in favor of Ms. Creager and Ms. Hammond. The Diamonds have filed this appeal of the judgment.
The Diamonds raise the following assignment of error:
 THE TRIAL COURT ERRED WHEN IT REFUSED TO GIVE JURY INSTRUCTIONS REGARDING THE INFERENCE OF THE FACT OF UNDUE INFLUENCE AND THE SHIFTING BURDEN OF PROOF AS REQUESTED BY PLAINTIFF-APPELLANT, BETTY DIAMOND.
The Diamonds argue that the trial court erred in refusing to give the requested jury instruction as they were correct statements of law. We agree.
The jury instructions given by a trial court must be a correct, clear, and complete statement of the law applicable to the case. Sharp v. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312; Marshall v. Gibson (1985), 19 Ohio St.3d 10, 12. We have previously stated that a "trial court should give any requested instruction if it is an accurate statement of the law applicable to the facts of the case and reasonable minds could reach the conclusion sought by the instruction." Horton-Thomas v. Avva (Feb. 9, 2001), Montgomery App. No. 18332, unreported, citing Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585,591. However, a trial court's decision on jury instructions is treated with deference and an appellate court will not reverse absent an abuse of discretion. Jaworski v. Medical Radiation Consultants (1991),71 Ohio App.3d 320, 327-328. An abuse of discretion amounts to more than an error of judgment, but amounts to an attitude that is "unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217. Further, the party seeking reversal must show that the absence of the jury instruction was prejudicial to the substantial rights of its proponent. Hammerschmidt v. Mignogna (1996), 115 Ohio App.3d 276,280; Jaworski, supra.
In order to establish that a decedent executed a probated will while under undue influence, a party must establish that (1) the decedent was a susceptible testator; (2) beneficiary had the opportunity to exert influence, (3) the beneficiary improperly exerted or attempted to exert influence; and (4) the decedent's will was affected by the beneficiary's influence. Lah v. Rogers (1998), 125 Ohio App.3d 164, 171. However, one can give rise to the presumption of undue influence and shift the burden of going forward on to the beneficiary by establishing that a confidential relationship existed between the decedent and the beneficiary. Rogers, supra, citing In the Matter of Guardianship of Blumetti (Jan. 14, 1994), Trumbull App. No. 92-T-4752, unreported. A confidential relationship exists whenever trust and confidence is placed in the integrity and fidelity of another. Thorp v. Cross (October 16, 1998), Portage App. No. 97-P-0079, unreported. A confidential relationship can be moral, social, domestic, or merely personal in nature. Thorp, supra, citing Indermill v. United Savings (1982),5 Ohio App.3d 243.
In Thorp, the Eleventh District Court of Appeals held that a caregiver of a donor can be found to be in a confidential relationship with the donor and a jury instruction on the issue is appropriate. Thorp, supra (holding that a caregiver, who provided exclusive care to the donor, drove the donor to the hospital, set up appointments with an attorney, and did domestic chores, could be found to be in a confidential relationship with the donor even though the caregiver exercised no control over the donor's financial affairs or medication). The Thorp Court stated:
 [t]he existence of a confidential relationship could have a profound effect on the trier of fact's determination of whether [the beneficiary] exerted undue influence over [the decedent]. Indeed, if a confidential relationship is found to have existed, there is a presumption that any transaction between [the decedent] and [the beneficiary] is invalid.
Thorp, supra citing Peterson v. Mitchener (1947), 79 Ohio App. 125,133. "If a confidential relationship exists the burden of going forward with evidence shifts to [the donee] to show the absence of undue influence." Thorp, supra citing McAdams v. McAdams (1909),80 Ohio St. 232; Taylor v. Shields (1951), 64 Ohio Law Abs. 193, 196 fn. 2.
In Wallbrown v. Kent State University, the Eleventh District Court of Appeals again reiterated that a caregiver may be found to be in a confidential relationship with a decedent whom they cared for prior to death. (June 2, 2001), Portage App. No. 99-P-0095, unreported (finding that a trial court properly found a confidential relationship to exist and shifted the burden of going forward where a friend who became a caregiver for the decedent for four months even though the decedent was mentally competent, strong willed, and did not speak to the caregiver about his financial affairs). The Wallbrown court restated that when a confidential relationship is found between a donor and a caregiver donee:
 a presumption of undue influence arises and the burden of going forward with evidence shifts to the donee to show that his conduct was free of undue influence or fraud and that the donor acted voluntarily and with a full understanding of his act and its consequences * * * The donee may rebut the presumption of undue influence by a preponderance of the evidence.
Wallbrown, supra citing Blumetti, supra.
In the matter before us, the Diamonds contested Mrs. Jacob's will, claiming that the will was executed while Ms. Creager and Ms. Hammond were applying undue influence on Ms. Jacob. The Diamonds sought an instruction from the trial court on whether a confidential relationship existed between Ms. Creager, Ms. Hammond, and Mrs. Jacob. We find the instant situation similar to the situations in Thorp and Wallbrown. In both of those cases, the caregiver exercised nearly exclusive care over the donor during the time that the donor made the gift or will. Here, either Ms. Creager and Ms. Hammond were with Mrs. Jacob for twenty-four hours, five days a week except for vacations and weekends. Further Ms. Creager, like the donees in Thorp and Wallbrown, contacted the attorney to arrange for the change in the will and were both present during the meeting with the attorney.
Ms. Creager argues that Thorp and Wallbrown are distinguishable because she was employed as the caregiver for Mrs. Jacob and not a voluntary caregiver as in Thorp and Wallbrown. We do not find that the fact that Ms. Creager and Ms. Hammond were employed to care for Mrs. Jacob distinguishes this case from Thorp and Wallbrown. A confidential relationship is defined as when trust and confidence is placed in the integrity and fidelity of another, regardless of whether the donee was paid to perform the services he did. Attorneys have been held to be in a fiduciary or a confidential relationship with their client, despite the fact that the client was paying the attorney for the attorney's services. Kirschbaum v. Dillon (1991), 58 Ohio St.3d 58. Therefore, we do not find that the fact that Ms. Creager and Ms. Hammond were employed as caregivers eliminates them from being found to be in a confidential relationship with Mrs. Jacob.
Moreover, Ms. Creager and Ms. Hammond went beyond the job they were hired to do in caring for Mrs. Jacob. Ms. Creager and Ms. Hammond were hired to care for Mrs. Jacob in a manner such as bathing and personal hygiene, as she no longer could care for herself and did not want to go to a nursing home. However, Ms. Creager and Ms. Hammond went beyond their hired tasks and assumed other tasks. They took it upon themselves to contact Mrs. Jacob's doctor and discuss her medication and use of alcohol and then set up a schedule for her medication. (Tr. 188, 189, 291-292, 312-313). The caregivers fired both the house cleaner and the individual who mowed the lawn and began assuming those responsibilities themselves. (Tr. 294-296, 295-296, 380, 525-528). Ms. Creager also began making purchases for Mrs. Jacob's home with Mrs. Jacob's permission. (Tr. 296). Further rather than have Mrs. Diamond who had authority to make financial decisions for Mrs. Jacob write the checks to pay the salaries of the caregivers and to buy household needs, Ms. Creager and Ms. Hammond filled out the checks themselves and had Mrs. Jacob sign them. (Tr. 50, 334, 366). We find this demonstrates a great deal of faith and trust on Mrs. Jacob's part being placed in Ms. Creager and Ms. Hammond's integrity and loyalty because Mrs. Jacob was legally blind. Mrs. Jacob was only able to sign the checks with the aid of a guide and could not see to whom the check was drafted or for what amount. This behavior strongly indicates a confidential relationship and was not part of Ms. Creager or Ms. Hammond's hired tasks. Additionally, Ms. Creager contacted two attorneys which she states was at Mrs. Jacob's request in order to arrange a meeting on short notice. (Tr. 306-307). When Mrs. Jacob's previous attorney was not available on short notice, Ms. Creager actively sought and obtained another. (Id.) In doing these tasks, Ms. Creager and Ms. Hammond exceeded the scope of their job and performed many tasks in which Mrs. Jacob had to place faith and trust in the caregivers' integrity and loyalty. The situation was sufficient to create an issue of whether a confidential relationship existed between Mrs. Jacob, the donor, and Ms. Hammond and Ms. Creager, the donees.
Furthermore, Ms. Creager attempts to distinguish Thorp and Wallbrown because they involved inter vivos transfers and a life insurance policy rather than a will. We do not find that it is relevant whether the transfer occurred inter vivos, through a trust, life insurance, or through the probate of a will. We find this argument without merit.
We now turn to whether the requested jury instruction by the Diamonds was an accurate statement of law. We find that the first, second, and fourth jury instructions proposed by the Diamonds were accurate statements of law. However, we find that the third proposed jury instruction misstated the law. The third proposed jury instruction reads as follows:
 If you find that a confidential relationship did exist between Norma Jacob and Bennie Creager and/or Kimberly Hammond, you may infer the fact of undue influence on the part of Bennie Creager and Kimberly Hammond, and the burden of proof shifts to the defendants to prove that their conduct was free from undue influence, and that Norma Jacob acted voluntarily and with a full understanding of her act and its consequences, by a preponderance of evidence.
(Emphasis added). In Thorp and Wallbrown, the Eleventh District Court of Appeals clearly stated that upon a finding of a confidential relationship, a presumption of undue influence arises and the burden of going forward with evidence shifts to the donee/defendants to show that their conduct was free from undue influence by a preponderance of the evidence. Therefore, the third proposed jury instruction was inaccurate in stating that the burden of proof would shift to the defendants and rather should have stated that the burden of going forward would shift to the defendants. Yet, even though the proposed jury instructions were not entirely accurate, we find that a jury instruction on whether a confidential relationship existed and the shifting burden of going forward if one is found to exist should have been given to the jury. Without a jury instruction on this issue, the jury instructions given failed to be a complete statement of the law applicable to the case. Therefore, we find that the trial court abused its discretion in failing to give any instruction on the issue of whether a confidential relationship existed and its ramifications.
Ms. Creager also argues that even if the trial court erred in failing to give the proposed jury instruction, it was not prejudicial as the Diamonds could not prove that Ms. Creager and/or Ms. Hammond exerted undue influence on Mrs. Jacob. At the trial, evidence was presented demonstrating that Ms. Creager and Ms. Hammond had performed many tasks in caring for Mrs. Jacob, including personal hygiene, writing checks, dispensing medications, and contacting an attorney to change Mrs. Jacob's will. Additionally, the evidence presented demonstrated that Mrs. Jacob was a "strong-willed" woman whose mind Ms. Creager testified was free of restraint. The evidence was sufficiently equal and conflicted that a jury could have inferred that a confidential relationship existed, which may have had a significant effect on the trier of fact's determination of whether Ms. Creager or Ms. Hammond exerted undue influence over Mrs. Jacob. Therefore, the trial court's error in failing to give any jury instructions on the issue of confidential relationships which was raised in the Diamonds' proposed jury instructions was prejudicial to the substantial rights of the Diamonds.
The Diamonds' assignment of error is sustained. The judgment of the trial court is reversed and remanded.
FAIN, J. and GRADY, J., concur.
(Hon. Stephen W. Powell sitting by assignment of the Chief Justice of the Supreme Court of Ohio).