[Cite as *In re Estate of Kiefer*, 2017-Ohio-6997.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MIAMI COUNTY

|  |  |
|---|---|
| IN THE MATTER OF THE ESTATE OF JOHN R. KIEFER, DECEDENT | : <br> : <br> :    Appellate Case No. 2016-CA-12 <br> : <br> :    Trial Court Case No. 86382-A <br> : |
| JASON KIEFER <br>      Plaintiff-Appellant | : <br> :    (CIVIL APPEAL FROM COMMON <br> :    PLEAS COURT PROBATE DIVISION) |
| v. | : <br> : |
| KIMBERLY KIEFER <br>      Defendant-Appellee | : |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 28th day of July, 2017.

. . . . . . . . . . .

WILLIAM MCGRAW, Atty. Reg. No. 007423 and SARAH WORLEY, Atty. Reg. No. 0082496, 210 W. Main Street, Troy, Ohio 45373

JAMES BLUMENSTIEL, Atty. Reg. No. 009164, 4242 Tuller Road, Suite B-1, Dublin, Ohio 43017

RICHARD KOLB, Atty. Reg. No. 0016449, 405 Madison Avenue, Suite 1000, Toledo, Ohio 43604
     Attorneys for Plaintiff-Appellant

ROBERT HUFFMAN, JR., Atty. Reg. No. 0040316, 80 South Plum Street, Troy, Ohio 45373
     Attorney for Defendant-Appellee

. . . . . . . . . . . . .

HALL, P.J.

**{¶ 1}** John Kiefer died, leaving a wife, Kimberly Kiefer, his only child, Jason Kiefer, and assets totaling almost $3.7 million. A sizeable portion of John's assets is the family farm, which has been in the Kiefer family for three generations. In his will, John left the farm to Kim. And before he died, John made Kim the beneficiary of numerous investment accounts. Jason contested the will and beneficiary changes. A jury found them all valid. Jason now appeals. Finding no error, we affirm.

## I. Background

**{¶ 2}** John and Kim began dating in 2001, and she moved in with John in 2008. John's mother died in 2008, leaving the family farm to John. In May 2009, John executed a will that leaves all his real estate, including the family farm, to Kim. To Jason, John left $20,000 in cash, as well as $30,000 in non-probate government bonds. Kim and John were married in January 2010, John for the fourth time. The week after they were married, John made Kim the beneficiary of his bank accounts, annuity, IRA, and other investments. On March 31, 2010, John executed his final will. It is identical to the 2009 will, save a change in Kim's last name from her maiden name to her married name, "Kiefer." John also executed a financial power of attorney and a health-care power of attorney naming Kim as his attorney-in-fact and executed a living will naming her as the contact person.

**{¶ 3}** John died approximately three years later in July 2013. The following November, Jason filed a will-contest action claiming that his father was not competent when he executed the final will and that Kim exercised undue influence over him. Jason also sought to set aside the beneficiary changes that his father made after he married Kim. After a jury trial, John's final will and beneficiary changes were all found to be valid.

On May 2, 2016, the probate court entered judgment on the jury's verdicts. Jason subsequently moved for a new trial, which the court overruled.

{¶ 4} Jason appealed.

## II. Analysis

{¶ 5} Jason assigns two errors to the probate court. The first challenges the judgment upholding the will and beneficiary changes. And the second challenges the overruling of the motion for a new trial.

### A. *The validity of the donative transfers*

{¶ 6} The first assignment of error alleges:

THE PROBATE COURT ERRED IN REFUSING TO GIVE A CONFIDENTIAL AND FIDUCIARY RELATIONSHIP JURY INSTRUCTION.

{¶ 7} "[A] 'trial court should give any requested instruction if it is an accurate statement of the law applicable to the facts of the case and reasonable minds could reach the conclusion sought by the instruction.' " *Diamond v. Creager*, 2d Dist. Montgomery No. 18819, 2002 WL 313137, *3 (Mar. 1, 2002), quoting *Horton-Thomas v. Avva*, 2d Dist. Montgomery No. 18332, 2001 WL 109146, *5 (Feb. 9, 2001), citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). But "a trial court's decision on jury instructions is treated with deference and an appellate court will not reverse absent an abuse of discretion." (Citations omitted.) *Id.* A decision is unreasonable if it is "not supported by a sound reasoning process." *AAAA Ent., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 8} Jason claims that John's will and beneficiary changes were the result of Kim's undue influence on John. To establish undue influence, the challenging party has the

burden to establish "(1) a susceptible party, (2) another's opportunity to influence the susceptible party, (3) the actual or attempted imposition of improper influence, and (4) a result showing the effect of the improper influence." *Ingle v. Ingle,* 2d Dist. Greene No. 2005CA110, 2006-Ohio-3749, ¶ 51, citing *West v. Henry,* 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962). But undue influence is presumed if the challenging party establishes that a confidential or fiduciary relationship existed between the donor and donee. *See Diamond* at *3. Because where such a relationship exists, " 'the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee.' " *Bayes v. Dornon*, 2015-Ohio-3053, 37 N.E.3d 181, ¶ 48 (2d Dist.), quoting *Studniewski v. Krzyzanowski,* 65 Ohio App.3d 628, 632, 584 N.E.2d 1297 (6th Dist.1989). "A confidential relationship exists whenever trust and confidence is placed in the integrity and fidelity of another." (Citation omitted.) *Id*. "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis*, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094 (1981).

{¶ 9} Here, Jason asked the court to give the jury the following instruction on the undue-influence presumption, based on the existence of a confidential or fiduciary relationship between John and Kim:

Plaintiff claims that a confidential and/or fiduciary relationship existed between John Kiefer and Kimberly Kiefer. This type of a relationship is described below:

A confidential and/or fiduciary relationship is one in which special confidence and trust is placed in the integrity and fidelity of another, who

acquires a resulting position of superiority or influence by virtue of this special trust. Such a relationship can be created through formal processes, such as the grant of power of attorney (fiduciary relationship) or by informal means, such as allowing another to care for personal matters of finance or health (confidential relationship).

For purposes of determining the element of opportunity to exert undue influence, the relationship of the parties is important. A person in a relationship of trust or confidence has more opportunity to exert undue influence than does a mere acquaintance.

Where a confidential or fiduciary relationship exists, the transfer of assets is looked upon with some suspicion that undue influence may have been brought to bear.

If you find that a confidential or fiduciary relationship existed between John Kiefer and Kimberly Kiefer, a presumption of undue influence arises and the burden of going forward with evidence shifts to Kimberly Kiefer to show that her conduct was free of undue influence and that John Kiefer acted voluntarily and with full understanding of his acts and there [sic] consequences.

If a confidential or fiduciary relationship existed between John Kiefer and Kimberly Kiefer, there is a presumption that any transaction between them is invalid.

* * *

The probate court declined to give the instruction because it concluded that, under Ohio

law, a marital relationship alone is not enough to show a confidential relationship.

{¶ 10} Commentators have observed that courts are reluctant to find a confidential relationship between spouses. *See* Thornley, *The Caring Influence: Beyond Autonomy As the Found. of Undue Influence*, 71 Ind. L.J. 513, 521 (1996) (saying that "courts rarely find that spousal relationships are confidential"); Madoff, *Unmasking Undue Influence*, 81 Minn. L. Rev. 571, 602 (1997) (saying that "[c]ourts are reluctant to find a confidential relationship among spouses and blood relatives."). "Many courts have held that there is no presumption of a confidential relationship between a husband and wife even where there is evidence of a spouse using influence to compel the execution of a will favorable to the spouse. Indeed, some courts have gone so far as to hold as a matter of law that there is no such thing as a confidential relationship between a husband and wife." Madoff, 81 Minn. L. Rev. at 585-586. As the most recent Restatement of Property explains, "[b]ecause generous donative transfers to the donor's spouse or surviving spouse are not unnatural, such transfers are rarely the result of undue influence." Restatement of the Law 3d, Property (Wills and Other Donative Transfers), Section 8.3, Comment f (2003).

{¶ 11} We have not found any cases in Ohio addressing the issue of undue influence in a spousal relationship. But cases involving blood relationships have held that no presumption of undue influence arises. In a case in which the beneficiary was the grandson of the testator and the grandson helped draft the will, the appellate court in *Lah v. Rogers*, 125 Ohio App.3d 164, 707 N.E.2d 1208 (11th Dist.1998), held that the presumption of undue influence did not arise, because the attorney had a blood relationship to the testator. *See Krischbaum v. Dillon*, 58 Ohio St.3d 58, 64, 567 N.E.2d 1291 (1991) (saying that the presumption of undue influence arises where the relationship

between an attorney and testator is that of attorney and client, the attorney is a beneficiary under the will, the attorney actively helped prepare the will, and "the attorney is not related by blood or by marriage to the testator"). Another appellate court has said that to support a presumption of undue influence between a parent and a child, a confidential or fiduciary relationship must exist separate and apart from the parent-child relationship. *Jeffreys v. Dennis*, 5th Dist. Guernsey No. 96CA25, 1996 WL 753141, *3 (Dec. 2, 1996). The court rejected the argument that the "mere existence of a confidential relationship between father and son * * * established a rebuttable presumption of undue influence." *Id.* at *2.

{¶ 12} Jason argues here that both a fiduciary relationship and a confidential relationship existed between John and Kim. As evidence of a fiduciary relationship, Jason points out that Kim held John's finance and health-care power of attorney. " 'The holder of a power of attorney has a fiduciary relationship with his or her principal.' " *Fields v. Brackney*, 2d Dist. Montgomery No. 23852, 2011-Ohio-1128, ¶ 20, quoting *In re Scott*, 111 Ohio App.3d 273, 276, 675 N.E.2d 1350 (6th Dist.1996). And the holder of a power of attorney is "not required to have used his power of attorney in order for a confidential or fiduciary relationship to arise." *Bayes*, 2015-Ohio-3053, 37 N.E.3d 181, at ¶ 48.

{¶ 13} At the same time that John executed his final will in March 2010, he also named Kim his attorney-in-fact for financial and health-care decisions. But in reality, John had already decided to leave his property to Kim when he executed his prior will in 2009. And at that time, Kim was not John's attorney-in-fact. Also, John executed his final will and named Kim his attorney-in-fact at essentially the same time. So any fiduciary relationship that arose barely existed when John executed the will. As to the beneficiary changes, John named Kim the beneficiary of his investments well before John gave her

the powers of attorney. We see little evidence that a fiduciary relationship existed between John and Kim at the pertinent time.

{¶ 14} As for the existence of a confidential relationship, Jason cites Kim's testimony that she and John had lived together since August 2008, that John confided in and trusted her, and that there was no one he confided in more. Jason also cites Kim's testimony that John would listen to her point of view and that she and John would discuss matters together and make joint decisions. But this describes any good marriage. It makes little sense to view as suspicious a transfer between spouses in a stable marriage. Like the Restatement says, "[a] dispositive plan favoring either spouse or partner is not considered unnatural." Restatement, Section 8.3, Comment f. We are not saying that a transfer between spouses can never raise a presumption of undue influence. Rather, we agree with the trial court that an undue-influence presumption does not arise based solely on the marital relationship. If it did, a testate inheritance of every surviving spouse would be subject to a presumption of undue influence. Something more is needed.

{¶ 15} That something more in the Restatement is suspicious circumstances. "There must also be suspicious circumstances surrounding the preparation, execution, or formulation of the donative transfer," says the Restatement, that "raise an inference of an abuse of the confidential relationship between the alleged wrongdoer and the donor." Restatement, Section 8.3, Comment h. But in this case, whatever the something more is—be it suspicious circumstances or something else—it is not present in the record of this case. The evidence here shows little reason to view John's transfers to Kim as suspicious.

{¶ 16} As we said, John actually made his decision to leave everything to Kim in

May 2009, when he executed his prior will. John's final will, the one contested here, differs from the prior will only in Kim's last name. Although Kim knew the contents of the 2010 will before John executed it, she did not find out about the contents of the 2009 will until afterwards. The events leading up to the 2009 will began in March of that year when, according to Jason, John called him and asked him if he wanted the farm. Kim testified that she did not know about this offer. The next month, April, while Jason was visiting, he and John discussed the matter, and Jason told Kim that John wanted to give her the farmhouse and him the farm. But the will that John executed the following May left the farm to Kim. Kim testified that she was surprised by John's decision. She said that she had said nothing to John about the farm. She was not present when he signed the 2009 will. She did not even know that John had been discussing the will change with his attorney. Although Kim said that she does not know why John left the farm to her rather than Jason, she speculated that a "personal property dispute" and Jason's request for $80,000 for college could be behind John's decision. (Tr. 108). Kim said that Jason's request offended John. Also, Kim testified that John and Jason did not have a very good relationship.

{¶ 17} Ultimately, it does not matter why John decided to leave the farm to Kim. He did not need to explain himself. We see nothing particularly suspicious here about any of John's donative decisions, nothing that suggests that John's decision to leave the bulk of his assets to his wife was anything other than his free and independent decision. On this record, the trial court did not abuse its discretion by not giving the presumption-of-undue- influence instruction that Jason requested.

{¶ 18} The first assignment of error is overruled.

B. *Motion for a new trial*

{¶ 19} The second assignment of error alleges:

THE PROBATE COURT ERRED IN DENYING A NEW TRIAL WHEN THERE WAS JURY MISCONDUCT.

{¶ 20} Jason moved for a new trial based on jury misconduct, a valid reason for a new trial under Civ.R. 59(A)(2). He argues that there was misconduct during deliberations, that one juror dominated the others by not allowing them to express their views and intimidating those who disagreed with him.

{¶ 21} On the second day of the jury's deliberations, one of the jurors left the jury room and said that she did not intend to return because of the behavior of the dominating juror. The trial court discussed the matter with the attorneys, and all agreed that the judge should talk to the juror on the record, outside of the presence of the other jurors and the attorneys. After interviewing the juror, the court gave counsel a detailed account of the interview. Both attorneys and the court then agreed that the court would give a modified *Allen* charge to the jury. Jason's counsel repeatedly stated that he desired to avoid a mistrial. And counsel never objected to the manner in which the court handled the matter. Indeed, when invited to note any objections for the record, Jason's counsel was silent.

{¶ 22} "[F]orfeiture is the failure to timely assert a right or object to an error." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21. " ' It is a well-established rule that " 'an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' " ' " *Id.*, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19

N.E.3d 900, ¶ 15, quoting *State v. Awan,* 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986), quoting *State v. Childs,* 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus. Jason did not move for a mistrial or a new trial based on the trial court's handling of the matter or lodge any objections. Consequently he forfeited his right to a new trial on grounds of juror misconduct.

{¶ 23} The second assignment of error is overruled.

### III. Conclusion

{¶ 24} We have overruled both assignments of error presented. The probate court's judgment is affirmed.

. . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

William McGraw
Sarah Worley
James Blumenstiel
Richard Kolb
Robert Huffman, Jr.
Hon. W. McGregor Dixon, Jr.