[Cite as *Newcomer v. Roan*, 2016-Ohio-541.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

David C. Newcomer, in his capacity as
Trustee of the Revocable Trust
Agreements of Betty S. Strickland

        Appellee

v.

Ann Roan, et al.

        Appellants/Cross-Appellees

and Thomas Levenson

        Appellee/Cross-Appellant

Court of Appeals No. WM-14-007

Trial Court No. CI20124001


**DECISION AND JUDGMENT**

Decided:  February 12, 2016

* * * * *

James R. Jeffery, for appellee.

Timothy A. Shimko, for appellants/cross-appellees.

William T. Maloney and Sarah A. McHugh, for appellee/cross-appellant.

* * * * *

**JENSEN, P.J.**

**{¶ 1}** This case is before the court upon an appeal filed by Ann, Steven, and Kerry

Roan (collectively, "the Roans"), and a cross-appeal filed by Thomas Levenson ("Tom").

The Roans and Tom were named as defendants in the underlying action filed by David Newcomer, the trustee of a trust created by Betty Strickland, Ann and Tom's mother. This case arises out of their disagreement over how that trust should be administered.

{¶ 2} The Williams County Court of Common Pleas issued judgments dated February 19, 2014 (decision on cross-motions for summary judgment), October 8, 2014 (judgment memorializing the court's decisions on the Roans' motions for directed verdict and entering its decision on the issues that proceeded to a verdict), and December 31, 2014 (decision denying the Roans' motion for permanent injunction and dissolving preliminary injunction). For the reasons that follow, we affirm the February 19, 2014 judgment; affirm, in part, and reverse, in part, the October 8, 2014 judgment; and affirm the December 31, 2014 judgment.

## I. Background

{¶ 3} Betty Strickland was the daughter of one of the two founders of the Spangler Candy Company in Bryan, Ohio. She married Neil Levenson and together they adopted Ann in 1952, and three years later, Tom. In the 1980s, Betty and Neil moved to Vero Beach, Florida, where they lived most of the year; they spent their summers in Bryan, Ohio. Neil died in 1992. Betty remarried Harold Strickland, who died in 1997.

{¶ 4} Betty and Neil owned a substantial number of shares in Spangler Candy Company. They wanted future generations to remain invested in the company. Apparently apprehensive about their children's ability to manage money and concerned that they may not retain the shares, Neil created a revocable trust on June 12, 1991, the

2.

effect of which was to hold the Spangler Candy shares in trust and provide Ann and Tom with income on the shares. Following Ann and Tom's deaths, ownership of the shares would pass outright to their children. Ann and her husband, Steven Roan, had one son, Kerry. Tom had no children.

## A. Betty Executes a Number of Trust Documents

{¶ 5} On October 28, 1991, Betty executed a revocable trust agreement which contained substantially the same terms as the trust executed by Neil. She executed a number of amendments and restatements in the years that followed. The following table chronologically lists the various trust documents Betty executed.

| | |
|---|---|
| October 28, 1991 | Revocable Trust Agreement |
| March 20, 1998 | Restatement of the Betty S. Strickland Revocable Trust Agreement |
| April 22, 1998 | First Amendment to the Betty S. Strickland Trust Agreement |
| April 20, 1999 | Second Restated Exhibit A to the Restatement of the Betty S. Strickland Trust Agreement |
| August 29, 2000 | First Amendment to the Second Restated Exhibit A to the First Restatement of the Betty S. Strickland Trust Agreement |
| March 4, 2002 | Second Amendment to the Second Restated Exhibit A to the Restatement of the Betty S. Strickland Trust Agreement |
| July 25, 2003 | Addendum to Trust Agreement Dated October 28, 2001 |
| October 20, 2003 | Third Complete Restatement of the Revocable Trust Agreement of Betty S. Strickland |
| August 24, 2006 | Second Amendment to the Betty S. Strickland Trust Agreement |

{¶ 6} The March 20, 1998 document completely superseded the October 28, 1991 trust. The provisions for the disposition of the Spangler Candy stock were contained in an exhibit A. Like the October 28, 1991 trust, it provided for the payment of income on the Spangler Candy stock to Betty's children, and provided for the eventual disposition of the shares outside the trust to Betty's grandchildren.

3.

{¶ 7} The April 22, 1998 document appointed a co-trustee, but otherwise restated the March 20, 1998 trust.

{¶ 8} The April 20, 1999 document restated exhibit A to provide, in paragraph A, that shares gifted to or held in trust for Tom's then-wife, Karon, would equal the number of shares gifted to or held in trust for Steven.

{¶ 9} The August 29, 2000 document revoked paragraph A of exhibit A, and inserted no new provision in its place. This change was precipitated by Tom and Karon divorcing. Confusingly, it then ratified the October 28, 1991 document despite the fact that it had been superseded by the March 20, 1998 document.

{¶ 10} The March 4, 2002 document added a new paragraph A, which the parties refer to as the equalization provision. It sought to ensure that Ann and Tom received an equal number of shares of Spangler Candy stock.

{¶ 11} The July 25, 2003 document appointed Betty's Bryan, Ohio attorney, David Newcomer, to be her successor trustee.

{¶ 12} The last two documents that Betty executed are at the heart of the parties' disagreement.

{¶ 13} The October 20, 2003 document was drafted by Betty's Florida counsel, Todd Fennell. It acknowledged the existence of each of the documents previously executed by Betty and restated Betty's entire trust. It distributed Betty's trust estate to her living descendants "outright and free of trust," thereby eliminating any remainder interest to her grandson.

4.

{¶ 14} The August 24, 2006 document was drafted by Newcomer. It acknowledged the existence of the October 28, 1991 trust agreement and the documents dated March 20, 1998, and April 22, 1998, but made no mention of the existence of the October 20, 2003 restatement or any of the other documents. It purported to change provisions that corresponded to the March 20, 1998 agreement. It made two changes, referred to as Item One and Item Two. Item One appointed Newcomer to replace Betty as trustee. Item Two "restate[d] and reaffirm[ed] each and every paragraph of said Restatement of Trust dated April 22, 1999."

{¶ 15} Betty died in Florida on March 30, 2011, at age 93. Her trust became irrevocable at that point. Within 60 days of becoming irrevocable, Fla.Stat. 736.0813 required her trustee to give notice to the beneficiaries of the trust's existence, the identity of the settlor, the right to request a copy of the trust instrument, and the right to an accounting. In accordance with this requirement, Fennell's partner, attorney Anthony Guettler, mailed to Ann and Tom on May 31, 2011, a notice of acceptance of appointment as successor trustee and related trust disclosures and a copy of the October 20, 2003 trust agreement. The notice, signed by Newcomer, indicated that Betty had served as trustee until her death, thus suggesting that Fennell and Guettler were unaware of the existence of the August 24, 2006 amendment drafted by Newcomer and executed by Betty in Ohio.

5.

## B. Lawsuits Are Filed

{¶ 16} Ann retained Florida counsel, inquiring about the possibility of setting aside the October 20, 2003 trust due to either a lack of capacity by Betty or undue influence by Tom. The existence of the August 24, 2006 document eventually came to her attorney's attention. In a letter to Ann dated April 13, 2012, counsel raised the possibility of arguing that the effect of the August 24, 2006 amendment was to revoke the October 20, 2003 trust agreement. Counsel communicated this theory to Newcomer in a letter dated May 12, 2012.

{¶ 17} On May 25, 2012, Newcomer, as trustee, filed a declaratory judgment action in the Williams County Court of Common Pleas seeking an order determining which trust agreement was the valid last trust agreement. In his complaint, he alleged that the April 22, 1999 date that appeared in the August 24, 2006 amendment was a typographical error and that April 20, 1999, was the date that should have been referenced in the August 24, 2006 amendment.

{¶ 18} The Roans answered and counterclaimed, alleging that the August 24, 2006 amendment revoked the October 20, 2003 amendment and "readopted" the April 20, 1999 version of Betty's trust.

{¶ 19} Tom answered, counterclaimed, and cross-claimed. He asserted a number of defenses, including that the declaratory judgment action was barred by the statute of limitations. In his counterclaim and cross-claim, he alleged that the October 20, 2003 trust agreement was the final and complete statement of the terms of the trust and was in

6.

effect on the date of Betty's death. He maintained that the August 24, 2006 amendment was not intended to revoke or alter the October 20, 2003 trust. Tom also alleged that Newcomer had not properly applied the equalization provision of the trust agreement. He sought Newcomer's removal as trustee due to a conflict of interest, and he claimed that Newcomer was negligent in preparing the August 24, 2006 amendment.

{¶ 20} The Roans filed a cross-claim against Tom, again alleging that the August 24, 2006 amendment operated to revoke the October 20, 2003 amendment and to readopt the April 20, 1999 version of the trust. They also asserted a number of defenses to Tom's cross-claims, including that the October 20, 2003 restatement was procured under fraud, duress, or undue influence.

{¶ 21} Tom replied to the Roans' cross-claim, denying their allegations and asserting a number of defenses. His reply did not contain a statute of limitations defense, but it asserted that Betty lacked the capacity to execute the August 24, 2006 amendment or was under undue influence at the time of its execution.

{¶ 22} Tom also filed an action in Indian River County, Florida on October 17, 2012, against both Newcomer and Ann. The Roans and Newcomer sought an order from the Williams County Court of Common Pleas enjoining Tom from prosecuting the Florida action. The court granted their motion for temporary injunctive relief on November 29, 2012. It granted a preliminary injunction to the Roans on May 3, 2013.

7.

## C. The Parties Move for Summary Judgment

{¶ 23} The Roans filed a motion for summary judgment. They argued that in order for Tom to prevail, he must establish by clear and convincing evidence that Betty lacked capacity or was subjected to undue influence at the time she executed the August 24, 2006 amendment. They attached to their motion a number of affidavits of people who had interacted with Betty in the days preceding her execution of the August 24, 2006 amendment, all of whom attested that she conversed with them intelligently and appeared to be oriented and in control of her faculties. The Roans also urged that Tom could not establish by clear and convincing evidence any basis to remove Newcomer as trustee, and that Tom lacked standing to assert a malpractice claim against Newcomer.

{¶ 24} In support of their motion for summary judgment, one of the affidavits the Roans submitted was from Newcomer. Newcomer attested that on August 24, 2006, Betty came to his office because she wished to appoint him to replace her as trustee. He stated that while at his office, Betty specifically told him that "she wanted to make sure that the ultimate disposition of the trust assets followed that of Neil Levenson's trust. To that end she asked that the instrument restate that disposition." He said that "it was always her intention to make the distribution of assets within her trust consistent with the distribution of assets set forth in the Trust of her late husband." Newcomer described that Betty waited while he made the changes reflected in the August 24, 2006 amendment, and he "personally saw her execute" the document. He also recounted that he spoke with

8.

her to determine her capacity to make the changes, and that from his professional observations, she was "lucid and of sound mind and memory to dispose of her property."

{¶ 25} The parties engaged in substantial discovery before Tom responded to the Roans' motion and filed his own cross-motion for summary judgment. In his opposition to the Roans' motion, Tom argued that a question of fact existed as to Betty's competence at the time she executed the August 24, 2006 trust.

{¶ 26} To begin with, Tom pointed out that while the body of the amendment drafted by Newcomer was dated August 24, 2006, the notarization bore the date of August 28, 2006.[1] Tom obtained medical records that demonstrated that Betty was actually in the midst of a nine-day hospitalization on that date. Those records indicated that Betty had decreased cognition and at the request of her physician, she underwent a neuropsychological evaluation due to "patterns of confabulation, confusion, and difficulties with organization and problem solving." The records also indicated that Newcomer had spoken to Betty's doctors about concerns he had about her "thought processes" at that time.

{¶ 27} As to the Roans' position that Tom failed to establish clear and convincing evidence that Newcomer should be removed as trustee, Tom argued that Newcomer was not impartial. He urged the trial court to defer to the Florida probate court to determine

---

[1] Despite the August 28, 2006 execution of the document, for the sake of consistency, we continue to refer to the amendment as the August 24, 2006 document.

9.

the issue. He also asserted that as a beneficiary of the trust, he had standing to assert a malpractice claim against Newcomer.

{¶ 28} In regard to his own motion for summary judgment, Tom claimed that (1) the statute of limitations barred any action to contest the validity of the October 20, 2003 trust; (2) the August 24, 2006 amendment did not revoke the October 20, 2003 restatement; and (3) regardless of whether the August 24, 2006 amendment revoked the October 20, 2003 restatement, the equalization provision remained in effect.

{¶ 29} In support of his statute of limitations defense, Tom cited Fla.Stat. 736.0604 which provides that:

> An action to contest the validity of a trust that was revocable at the settlor's death is barred, if not commenced within the earlier of:
>
> (1) The time as provided in chapter 95; or
>
> (2) Six months after the trustee sent the person a copy of the trust instrument and a notice informing the person of the trust's existence, of the trustee's name and address, and of the time allowed for commencing a proceeding.

Tom contended that because Newcomer filed suit more than 12 months after the notice described in Fla.Stat. 736.0604, the statute of limitations barred the action.

{¶ 30} Relying on an affidavit from his retained expert, Ohio estate-planning attorney, Michael Henry, Tom asserted that the August 24, 2006 amendment employed a template that was created while the March 20, 1998 restatement was still in effect. He

10.

claimed that the item purportedly reaffirming the April 22, 1999 trust was a common provision not ordinarily intended to have substantive effect. Its intention, he explained, was just the opposite—to signal to the reader that no further changes were intended and that the remaining terms of the current trust are reaffirmed.

{¶ 31} Tom discussed Newcomer's deposition testimony in this regard. Newcomer testified that he did not know that the October 20, 2003 trust agreement existed when he drafted the August 24, 2006 amendment. He believed that Betty was executing the August 24, 2006 amendment simply to make him the trustee, and he said that if he had understood that Betty wished to revoke the current version of the trust, he would have expressly written this and would have drafted an entirely new trust agreement. Tom countered the Roans' argument that the "plain and ambiguous meaning" of the amendment was to revoke the October 20, 2003 trust and to revert to the April 20, 1999 trust, responding that (1) the date "April 20, 1999" does not appear at all in the August 24, 2006 amendment—it refers to an April 22, 1999 document which does not exist; (2) the work "revoke" is never used; and (3) the document was not intended to accomplish the purpose advanced by the Roans. He urged that the October 20, 2003 restatement was put in place after careful planning whereas the August 24, 2006 amendment contained inconsistencies and inaccuracies.

{¶ 32} Finally, Tom argued that regardless of whether the August 24, 2006 amendment effectively revoked the October 20, 2003 restatement, the equalization

11.

provision remained valid. This, he claimed, is because the August 24, 2006 document is not a stand-alone document—it amended only the specifically-referenced provisions.

{¶ 33} The Roans replied to Tom's arguments. While they conceded that Newcomer had incorrectly recalled the circumstances surrounding the execution of the August 24, 2006 amendment, they insisted that Tom failed to establish that Betty was incompetent or unduly influenced. They claimed that the mental capacity required of Betty depended on the nature of the transaction. Here, they argued, Betty was required to understand the business in which she was engaged, to comprehend generally the nature and extent of her property, to hold in her mind the names and identity of those who have natural claims upon her bounty, and to be able to appreciate her relations to the members of her family. They insisted that evidence that Betty's health was deteriorating—and even evidence of dementia on the date of execution—standing alone, was insufficient to establish that she lacked capacity to execute the amendment. And despite the fact that Betty's doctor ordered a neuropsychological exam, the Roans maintained that the medical records demonstrated that Betty was oriented to person, place, and time on August 28, 2006, and had even signed a health care directive during her hospitalization.

{¶ 34} Addressing Tom's statute of limitations argument, the Roans claimed that Tom waived this defense because he failed to plead it as an affirmative defense in reply to their cross-claim and failed to amend his pleadings before moving for summary judgment. The Roans also argued that the statute of limitations never began to run because Newcomer failed to serve the August 24, 2006 document with the required

12.

notice. They urged that while Fla.Stat. 736.0604 prohibits contestants to a trust from bringing suit after six months, it does not prohibit a trustee from bringing an action seeking the court's guidance in applying inconsistent provisions within trust documents. Finally, the Roans argued that the six-month statute of limitations may be asserted only by the trustee—all other individuals are bound by the four-year limitations period set forth in Fla.Stat. 95.11(p). Here, they urged, the trustee is estopped from asserting the six-month statute of limitations because he failed to serve the August 24, 2006 amendment.

{¶ 35} The Roans claimed that the distribution of assets as set forth in the April 20, 1999 restated exhibit A must be applied. This, they argued, meant that the method of distribution established in the October 28, 1991 trust document governed.

{¶ 36} Tom filed a reply in support of his motion for summary judgment. He argued that the Roans' cross-claim raised no new claims against him, thus his pleading of the statute of limitations defense in response to the trustee's complaint sufficed to preserve the defense. In the event the court disagreed, Tom sought leave to amend his reply to the cross-claim. He distinguished case law relied upon by the Roans, including *Am. Diversified Devs. v. Hinti Constr.*, 8th Dist. Cuyahoga Nos. 73116, 73168, 1998 WL 767618 (Oct. 29, 1998), where the Eighth District held that the affirmative defense of personal jurisdiction was waived where it had been raised in response to the original complaint, but not in the reply to the cross-claim. He claimed that Civ.R. 12 provides for

13.

the waiver of lack of personal jurisdiction as a defense if not pled, but the rule does not apply to the defense of statute of limitations.

{¶ 37} As for the Roans' other responses to his statute of limitations arguments, Tom contended that equitable estoppel could be asserted only where there was misconduct inducing the party not to act. Tom denied that there had been any misconduct. He also argued that the delayed discovery doctrine did not apply in this context.

{¶ 38} Tom also disputed that the second restated exhibit A—the April 20, 1999 document—was applicable because it was prepared while Tom was married to his former wife, Karon, and contained an equalization provision in Karon's favor. Betty ultimately replaced the equalization provision to favor Tom instead of Karon.

{¶ 39} The trial court granted the Roans' motion for summary judgment on Tom's legal malpractice claim, but it denied the Roans' motion for summary judgment on Tom's claim for removal of the trustee. The court also found that no evidence was presented in support of Tom's claim of undue influence, and the court granted summary judgment to the Roans on this claim. As to capacity, the court determined that Tom submitted medical records containing evidence that could support his assertion that Betty was not competent on August 28, 2006. It denied the Roans' summary judgment motion on this issue.

{¶ 40} Turning to which document constituted the last valid trust agreement and which provisions applied, the court determined first that the reference in the August 24,

14.

2006 document to the "April 22, 1999 restatement" was a typographical error and that the April 20, 1999 document was intended to be referenced in the amendment. As to whether Betty intended to amend her trust to distribute her assets consistent with Neil's 1991 trust, the trial court concluded that this was an issue that must be resolved at trial. The court held, however, that under Ohio procedural law, Tom waived the statute of limitations defense by failing to assert it in his reply to the Roans' cross-claim. The court also agreed that the statute of limitations did not begin to run because the notice did not attach the August 24, 2006 amendment.

{¶ 41} Concerning the equalization provision, the court held that if the April 20, 1999 document controls, then so would its provisions for disposition, which do not include the equalization provision. If the August 24, 2006 amendment did not revive the April 20, 1999 document, then the equalization provision in the October 20, 2003 trust document would control. The court held that this issue could not be determined on summary judgment.

{¶ 42} Finally, the court held that there was a question of fact as to the validity of Item Two and whether Item Two of the August 24, 2006 amendment was a mistake. It acknowledged the evidence that Tom submitted that would tend to show that it was a mistake, but it was ultimately persuaded that a question of fact existed.

{¶ 43} Following the trial court's summary judgment decision, the Roans filed a brief in which they conceded that Betty did not revoke the equalization provision of the October 20, 2003 restatement, however, they explained to the court that they disagreed

15.

about how the provision should be applied. Tom's position was that Betty intended the equalization provision to ensure that Tom and Ann received the same number of shares of Spangler Candy stock, regardless of the source of the stock. He argued that the trust agreement provided precise numbers to be used as a starting point for calculating the number of shares that each was to receive. The Roans' position was that Betty intended that only the shares *she* gifted to her children be used in the calculation. In other words, they contended that shares given to them by others—which included shares that their maternal grandmother had gifted to Ann—should not be considered in the calculation. The Roans insisted that the numbers specified in the trust document were meant merely to provide an example of how to apply the formula for calculating the number of shares to be transferred.

### D. The Matter Proceeds to Trial

{¶ 44} The case went to trial beginning August 11, 2014. A jury was empaneled to hear evidence on the issue of whether Betty was competent for purposes of executing the August 24, 2006 document. The remaining issues were reserved for determination by the court.

{¶ 45} The Roans presented testimony from a number of witnesses who testified that Betty was competent at the time she executed the August 24, 2006 amendment, including two employees from Newcomer's office who witnessed her signature. The witnesses had no independent recollection of Betty executing the document, but both testified that it was not uncommon for them to travel to health care facilities for the firm's

16.

clients to execute documents. They testified that they would not have proceeded with the execution of the amendment had Betty not appeared to them competent to sign it.

{¶ 46} Tom presented the testimony of clinical neuropsychologist, Joan Lawrence, Ph.D., who examined Betty on August 29, 2006. She testified that she had no independent recollection of the exam and was testifying purely based on what was contained in her evaluation notes. According to those notes, she performed neuropsychological testing at the request of Betty's physician. The physician had commented that Betty's lawyer had concerns about her thought process and that Betty appeared to the medical, nursing, and therapy staff to display illogical thinking and to frequently present different stories to different staff members about various things.

{¶ 47} Dr. Lawrence described her examination. She first explained to Betty why she was there and obtained her consent to perform a battery of tests evaluating memory, visual and spatial skills, language, attention, and other aspects of delayed memory. Dr. Lawrence found that Betty performed at levels ranging from moderately impaired to average. However, Dr. Lawrence's behavioral notes indicated that Betty was alert and generally oriented in all spheres, except she thought it was August 27 instead of August 29. Dr. Lawrence noted that Betty's speech was fluent and functional and interpersonally, she was cooperative, engaging, cheerful, and unremarkable.

{¶ 48} Based on the results of her testing, Dr. Lawrence provided a differential diagnosis of delirium and dementia. She described delirium as "a kind of descent inconsistently transient alteration of the individual's ability to think, reason and process

17.

information" that typically lasts only "hours, days, [or] weeks." She described dementia as "a disorder of thinking that involve[s] a deficit in memory plus a deficit in any one of problem solving, self[-]awareness, voluntary motor movement or for language." Dr. Lawrence described that she had "significant concerns that [Betty's] current cognitive deficits, most particularly confusion, confabulation and memory problems could compromise her safety if she was in a position of needing to problem solve and communicate effectively to manage an emergent situation," such as a fall, weather emergency, etc.

{¶ 49} Dr. Lawrence made clear, however, that the testing she performed on Betty differs substantially from the type of evaluation that one would do to test someone's legal competence. She was adamant that she had not conducted an evaluation that would enable her to render an opinion one way or the other as to whether Betty was competent to execute the August 24, 2006 amendment. She also said she could not offer an opinion as to Betty's cognitive functioning on August 28, 2006, because the symptoms she observed in Betty can be transient. She did not administer any testing to assess psycho-legal concerns.

{¶ 50} The Roans moved for a directed verdict on the issue of Betty's competence and the court granted their motion. It explained that the burden was on Tom to establish by clear and convincing evidence that Betty was incompetent on the day she executed the August 24, 2006 amendment. The court reasoned that the only evidence supporting Tom's claim of Betty's incompetence was the medical records describing her as confused

18.

and "confabulating." It observed that the other witnesses—Newcomer, the two women from his office who witnessed the signature, Ann, and Steven—all testified that Betty was competent, and Dr. Lawrence refused to provide any opinion bearing on Betty's competence on the date the document was executed. It also disagreed with Tom that Betty could be competent for the purpose of changing her trustee, but incompetent for other purposes.

{¶ 51} On the claims as to the effect of the August 24, 2006 amendment, because Tom had conceded that Item One—which substituted Newcomer as trustee—was valid, the parties focused their evidence on whether Item Two constituted a substantive change to the terms of Betty's trust. Newcomer testified, as did Betty's Florida counsel, whose testimony was presented via trial deposition. Each side also offered expert testimony from Ohio estate planning attorneys supporting their respective positions. The evidence the parties presented was primarily consistent with the evidence and arguments they submitted in support of their cross-motions for summary judgment.

{¶ 52} After hearing the evidence, the trial court took a brief recess, then issued a decision from the bench, later reduced to a written judgment entry. It held that the October 20, 2003 restatement was the last valid statement of the substantive terms of the trust. The court recited its reasons for reaching this conclusion. It explained that the October 20, 2003 restatement was the starting point for its analysis because it was a complete restatement of Betty's trust. It recognized that under Fla.Stat. 736.0602, a settlor can modify, amend, or revoke a revocable trust, but it interpreted that statute as

19.

requiring that any such amendment manifest the settlor's intent by clear and convincing evidence. The court found the August 24, 2006 amendment to be ambiguous, thereby failing to clearly and convincingly establish Betty's intent.

{¶ 53} Newcomer's testimony was crucial to the court's decision. The court observed that Newcomer's recollection of the events was unclear to the point that his affidavit and trial testimony contradicted each other. But more important to the court's consideration was Newcomer's testimony that he told Betty that Item Two of the August 24, 2006 amendment changed nothing, and that he had nothing—no notes to the file, no letters from Betty, etc.—evidencing that it was her intent to change the dispositional provisions of the trust agreement. Also important to the court was that when sending the notice required by Florida law after Betty's death, Newcomer did not attach the August 24, 2006 amendment or even correct the Florida lawyers that he—not Betty—had been acting as trustee since 2006. The court expressed that it agreed with Tom's expert witness's interpretation that Item Two was merely a boilerplate reaffirmation clause that made no substantive change. It was unpersuaded by the Roans' expert witness's testimony to the contrary.

{¶ 54} As to the equalization provision, it held that the number of shares set forth in the provision was merely an example—and not a starting point—for calculating the number of shares that would need to be transferred to Tom in order to achieve Betty's objective of dividing her stock evenly between her two children. It held that Betty did

20.

not intend that shares transferred to Ann from other sources would be included in the calculation.

### E.  The Trial Court Dissolves the Injunction

{¶ 55} Following the trial, the court was left to consider whether to enter permanent injunctive relief prohibiting Tom from litigating his claims in Florida, or whether to dissolve the preliminary injunction that it had previously entered.  In a decision dated December 31, 2014, the trial court dissolved the injunction.  It recognized that Tom had filed claims in Florida identical to the ones litigated in Williams County, and it acknowledged that the parties would have to expend additional fees litigating in Florida.  It determined, however, that this would not cause irreparable injury because both Ohio and Florida have statutes providing for attorney fees to the prevailing party.  It also acknowledged the possibility of inconsistent rulings and agreed that this would constitute irreparable injury, but it reasoned that the Full Faith and Credit Clause of the U.S. Constitution required other states to give credit to and honor the rulings of Ohio courts.  In the end, the court found that the public interest was not served by enjoining a litigant from proceeding in another forum.  It dissolved the preliminary injunction and denied the Roans' motion for permanent injunction.

### F.  Both Parties Appeal

{¶ 56} The Roans disagree with the trial court's conclusion that the August 24, 2006 amendment did not revive the dispositional provisions of the April 20, 1999 document.  They are also dissatisfied with the trial court's decision to dissolve the

21.

injunction. Tom, on the other hand, believes that the court misapplied the equalization provision, improperly rejected his statute of limitations defense, and incorrectly directed a verdict in favor of the Roans on the issue of Betty's competence. They seek our review of the trial court's decisions in these regards.

{¶ 57} To that end, the Roans assign the following errors for our review:

**Assignment of Error I**

Exhibit 9 satisfied the requirements of Fl. Stat. § 736.0602 and established Betty's intent to amend her Trust in the manner specified in the Trust.

**Assignment of Error II**

The Trial Court erred as a matter of law in ruling that Ex. 9, the August 28, 2006 Second Amendment was ambiguous and in denying the Roans' Motions for Summary Judgment and Directed Verdict on that issue.

**Assignment of Error III**

The Trial Court erred as a matter of law in failing to grant the Roans' Motion for Directed Verdict on Levenson's claims that Betty Strickland executed Ex. 9, the August 28, 2006 Second Amendment due to a mistake.

**Assignment of Error IV**

The Trial Court's ruling rejecting Ex. 9 as an amendment to the Trust and finding that the Roans had the burden of proving that Betty

22.

intended to amend her trust by extrinsic clear and convincing evidence is contrary to Florida law.

## Assignment of Error V

The Trial Court's Judgment that Betty Strickland intended to terminate the Trust upon her death and eliminate the remainder interest that Kerry Roan had in the Trust is contrary to the manifest weight of the evidence.

## Assignment of Error VI

The Trial Court erred as a matter of law in dissolving the preliminary injunction it entered in this case by order dated May 3, 2013. Levenson assigns the following errors:

Assignment of Error #1:  The lower court erred in its interpretation of the Equalization provision of the Trust Agreement[.]

Assignment of Error #2:  The lower court erred in failing to apply the 6 month statute of limitations set forth in Section 736.0604 of Florida Statutes and in failing to permit a pleading amendment to assert it.

Assignment of Error #3:  The lower court erred in directing a verdict on the issue of competency[.]

## II. Law and Analysis

## A. The Roans' Appeal

### 1. The Effect of the August 24, 2006 Amendment

{¶ 58} The Roans' first five assignments of error all deal with the trial court's conclusions with respect to the effect of the August 24, 2006 amendment. They claim that Betty intended to amend the October 20, 2003 trust and did so in accordance with Fla.Stat. 736.0602. They challenge the trial court's denial of their motion for summary judgment and their motion for directed verdict based on its finding that the August 24, 2006 amendment was ambiguous. They also contend that the trial court incorrectly placed upon them the burden of establishing by clear and convincing evidence that Betty intended to amend her trust via the August 24, 2006 amendment. They argue that the trial court's decision was against the manifest weight of the evidence.

{¶ 59} Before addressing these claims, we discuss the various standards of review that we must apply in reviewing the Roans' assignments of error. Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving
> party is entitled to judgment as a matter of law; and (3) that reasonable
> minds can come to but one conclusion, and that conclusion is adverse to the

24.

party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 60} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

{¶ 61} Like a motion for summary judgment, a motion for a directed verdict also presents a question of law which must be reviewed employing a de novo standard of review. (Citations omitted.) *Bennett v. Admr., Ohio Bur. of Workers' Comp.*, 134 Ohio St.3d 329, 2012-Ohio-5639, 982 N.E.2d 666, ¶ 14. Under Civ.R. 50(A)(4), a motion for

25.

a directed verdict may properly be granted where, after construing the evidence most strongly in favor of the non-moving party, the trial court finds that "upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." In considering a motion for a directed verdict, the court cannot evaluate the weight of the evidence or the trustworthiness of witnesses. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284-285, 423 N.E.2d 467 (1981). The court must use the "reasonable minds" approach to determine whether there exists any material evidence that supports the arguments of the non-moving party. *Id.* Civ.R. 50(A)(4).

{¶ 62} Finally, when reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). Reversal on manifest weight grounds is reserved for the exceptional case in which the evidence weighs heavily against the judgment. *Thompkins* at 387.

{¶ 63} The Roans claim that the August 24, 2006 amendment satisfied the requirements of Fla.Stat. 736.0602 and established Betty's intent to amend the October 20, 2003 trust. Despite previously arguing that that amendment operated to

26.

revoke the October 20, 2003 trust, their position at trial was that it did not revoke, but merely amended, the October 20, 2003 restatement to provide for the method of distribution set forth in the April 20, 1999 amendment. They claim that the trial judge improperly ruled against them on this issue, purportedly on the basis that it "did not make sense" to him that Betty would change the dispositional scheme of the trust in 2003 only to revert to the original scheme in 2006. They insist that the plain meaning of the 2006 amendment evidences Betty's intention to do just that.

{¶ 64} Fla.Stat. 736.0602 governs the amendment of a revocable trust. It provides, in pertinent part:

(1) Unless the terms of a trust expressly provide that the trust is irrevocable, the settlor may revoke or amend the trust.

* * *

(3) Subject to s. 736.0403(2), the settlor may revoke or amend a revocable trust:

(a) By substantial compliance with a method provided in the terms of the trust; or

(b) If the terms of the trust do not provide a method, by:

* * *

2. Any other method manifesting clear and convincing evidence of the settlor's intent.

* * *

{¶ 65} Article XXII of the October 20, 2003 restatement permits the grantor "to amend or revoke [the] Agreement in whole or in part, at any time or times * * * by notice in writing, delivered to the Trustee." Thus, under Fla.Stat. 736.0602(3)(a), assuming that the August 24, 2006 document was an attempt to amend the October 20, 2003 restatement, Betty substantially complied with Article XXII by doing so in writing and delivering a copy to Newcomer. Although the trial court referenced a clear and convincing standard with respect to establishing an intent to revoke or modify a revocable trust, when the court's ruling is read in its entirety, it is obvious that the court actually agreed with the Roans that Betty validly modified her trust via the August 24, 2006 amendment. The question the court struggled with was the effect of that amendment.

{¶ 66} The court and the parties agreed that Item One unambiguously appointed Newcomer as trustee, so we will not address Item One of the August 24, 2006 amendment, despite the fact that (1) the August 24, 2006 amendment refers to Item Eleven—contained in the March 20, 1998 restatement—as authority for amending the terms of the trust even though the March 20, 1998 restatement was not the most current version of the trust; and (2) the notice sent pursuant to Fla.Stat. 736.0813, signed by Newcomer, indicates that Betty served as trustee until her death. Instead, we, like the trial court did, focus our attention on Item Two of the August 24, 2006 amendment.

28.

**{¶ 67}** Item Two provides as follows: "The Settlor hereby restates and reaffirms each and every paragraph of said Restatement of Trust dated April 22, 1999, as amended hereby." As previously discussed, the trial court concluded that the reference to the April 22, 1999 document was a typographical error and that the April 20, 1999 document was the intended reference.

**{¶ 68}** Under Florida law, "[t]he polestar of trust or will interpretation is the settlor's intent." *Bryan v. Dethlefs*, 959 So.2d 314, 317 (Fla.App.2007). It should be "ascertained from the four corners of the document through consideration of 'all the provisions of the will [or trust] taken together.'" *Id.*, quoting *Sorrels v. McNally*, 105 So. 106, 109 (Fla.1925). The trust instrument should be construed as a whole, taking into account the general dispositional scheme. *Id.*, citing *Pounds v. Pounds*, 703 So.2d 487, 488 (Fla.App.1997). The meaning applied must not lead to absurd results. *Id.*, citing *Roberts v. Sarros*, 920 So.2d 193, 196 (Fla.App.2006).

**{¶ 69}** If trust language is unambiguous, the settlors' intent as expressed in the trust controls and the court cannot refer to extrinsic evidence to interpret its meaning. *Ludwig v. AmSouth Bank of Fla.*, 686 So.2d 1373, 1376 (Fla.App.1997). That the parties ascribe different meanings to the language does not necessarily render the trust ambiguous. *Bryan* at 317, fn. 2.

**{¶ 70}** If, on the other hand, the trust is ambiguous, construction of the instrument is necessary. *First Nat. Bank of Florida v. Moffett*, 479 So.2d 312, 313 (Fla.App.1985). In construing a contract, the court must try to determine the meaning and intent of the

29.

language used by the parties by considering the surrounding circumstances and placing itself in the parties' situation. (Internal citations omitted.) *Miller v. Kase*, 789 So.2d 1095, 1098 (Fla.App.2001). Depending on the type of ambiguity that exists, Florida courts may or may not allow the parties to present extrinsic evidence of the settlor's intent. To that end, Florida courts differentiate between "patent" and "latent" ambiguities.

{¶ 71} "A patent ambiguity is [one] which appears on the face of the instrument, and arises from defective, obscure, or insensible language used." *Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So.2d 544, 547 (Fla.App.1973). Florida courts generally decline to allow the introduction of extrinsic evidence to construe a patent ambiguity. *Id.* A latent ambiguity, on the other hand, is one where "the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence create[s] a necessity for interpretation or a choice among two or more possible meanings." *Id.* In the case of a latent ambiguity, Florida courts allow the presentation of extrinsic evidence. *Id.*

{¶ 72} The Roans insist that there exists no ambiguity, and that the language in Item Two plainly manifested Betty's intent to incorporate by reference the provisions of the April 20, 1999 document. They apparently refuse to acknowledge that a latent ambiguity was created in that (1) the August 24, 2006 document "restated and reaffirmed" a document that did not exist, and (2) even assuming, as the trial court did, that the document intended to be referenced in the August 24, 2006 document was the

30.

April 20, 1999 document, that document had twice been amended (on August 29, 2000, and March 4, 2002), and then had been superseded by the October 20, 2003 restatement.

{¶ 73} The Roans claim that Tom asked the trial court to invalidate Item Two or to declare it a mistake. They insist that it was Tom's burden to establish the grounds for invalidity and to establish by clear and convincing evidence what the mistake was and what Betty's true intent was. They maintain that Tom failed in his burden.

{¶ 74} But the court's judgment entry does not indicate that its decision was premised on any mistake by either Betty or by Newcomer, the author of the August 24, 2006 document. In fact, this issue was discussed at length when the parties appeared before the trial court on October 8, 2014. In trying to finalize a judgment entry, counsel for the Roans sought to insert language indicating that the trial court found the August 24, 2006 document to be the result of a mistake. The trial court repeatedly corrected counsel that its decision was not premised on the finding of a mistake—it was based on its interpretation that both Betty and Newcomer intended only to change the trustee and not to make any other substantive changes via the August 24, 2006 document.

{¶ 75} In this regard, the Roans also claim that the trial court mistakenly focused on what Newcomer's intent was instead of relying on Betty's. They contend that Betty made her intentions clear when she directed Newcomer to include Item Two despite his insistence that Item Two was unnecessary. They rely on Fla.Stat. 732.512(1), which provides: "A writing in existence when a will is executed may be incorporated by

31.

reference if the language of the will manifests this intent and describes the writing sufficiently to permit its identification."

{¶ 76} While Florida courts do recognize the doctrine of incorporation by reference, they warn that "[c]onsiderable caution must be exercised in applying the doctrine of incorporation by reference." *Martin v. Martin*, 687 So.2d 903, 906 (Fla.App.1997), quoting *Flinn v. VanDevere*, 502 So.2d 454, 455-56 (Fla.App.1986). The doctrine requires that there must be an expression in the incorporating document of an intention to be bound by the collateral document. *Kantner v. Boutin*, 624 So.2d 779, 781 (Fla.App.1993). Specifically, "[t]o incorporate by reference a collateral document, the incorporating document must (1) specifically provide that it is subject to the incorporated [collateral] document and (2) the collateral document to be incorporated must be sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained." (Internal quotations omitted.) *BGT Group, Inc. v. Tradewinds Engine Servs., LLC,* 62 So.3d 1192, 1194 (Fla.App.2011). "A mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that it is 'subject to' the collateral document." *Kantner* at 781.

{¶ 77} We agree with Tom that the August 24, 2006 document does not suffice to incorporate the terms of the April 20, 1999 document. To begin with, like the trial court, we find Newcomer's testimony to be important. Newcomer testified that he told Betty that Item Two would not change the trust agreement. He made clear that he would not

32.

have used a form like the August 24, 2006 document to make a substantive change to a trust agreement, and in fact, said that was "[n]ot what I thought I was doing." He believed that he was merely changing the trustee. He said he would "absolutely not" make a major change to her estate plan in this way.

{¶ 78} But beyond Newcomer's intent in drafting the document, the same result must be reached in considering Betty's intent. The Roans went to great lengths in arguing that Betty was intelligent, competent, and completely aware of the dispositional provisions of her trust documents. Given their position, it does not follow that Betty would attempt to alter those provisions by mere reference to an incorrectly-dated document that had actually given shares of her family stock to her ex—and by that time, deceased—daughter-in-law. This is especially true given that she had executed four additional amendments or restatements in the years that followed the execution of the April 20, 1999 document—one expressly revoking a portion of that document. Moreover, the evidence supports Tom's contention that the October 20, 2003 document was the product of a careful, comprehensive estate-planning process which extended over many months. During the course of that process, Betty met with her counsel in Florida, spoke with him on the phone, handwrote him letters expressing her desire that the stock be "placed out of trust and [that] no cash [be] involved," and arranged for him to receive copies of all of her trust documents and details about her assets. Before she executed the October 20, 2003 restatement, she was provided with a flow chart summarizing the terms and effect of the restatement. If Newcomer instructed her that Item Two was

33.

unnecessary and would change nothing, a woman of Betty's intelligence and sophistication would surely have been more careful in ensuring that her intentions were carried out properly.

{¶ 79} In addition to this, Newcomer served as trustee, both before and after Betty's death. Although aware of the existence of the August 24, 2006 document, it was not until the Roans' attorney's suggestion, a year later, that Newcomer even entertained the possibility that Item Two of the August 24, 2006 document may have had any substantive effect. This is certainly consistent with the trial court's and our interpretation that Item Two made no substantive changes to the October 20, 2003 restatement.

{¶ 80} For these reasons, we find the Roans' first five assignments of error not well-taken.

## 2. Injunctive Relief

{¶ 81} In their sixth assignment of error, the Roans argue that the trial court erred in dissolving the preliminary injunction and in denying their motion for permanent injunction. They contend that Tom seeks to deplete the trust assets by forcing the trustee to use trust funds to defend a case that has already been litigated. They maintain that Tom is simply trying to harass and vex them by compelling them to pay substantial attorney fees to relitigate claims that have already been resolved in Ohio.

{¶ 82} "To establish a claim for injunctive relief, a plaintiff must show, by clear and convincing evidence: (1) the likelihood of success on the merits; (2) granting the injunction will prevent irreparable harm; (3) the potential injury that may be suffered by

34.

the defendant will not outweigh the potential injury suffered by the plaintiff if the injunction is not granted; and (4) the public interest will be served by the granting of the injunction." *Byers DiPaola Castle, L.L.C. v. Portage Cty. Commrs.*, 2015-Ohio-3089, ¶ 68, 41 N.E.3d 89 (11th Dist.), citing *Cleveland v. Cleveland Elec. Illuminating Co.*, 115 Ohio App.3d 1, 12, 684 N.E.2d 343 (8th Dist.1996).

{¶ 83} The Roans claim that without an injunction, they will suffer irreparable injury because if Tom is permitted to litigate in Florida, they will be exposed to inconsistent rulings, they will lose further time, the trust assets will be further depleted, and they will incur exorbitant attorney fees, litigation costs, and travel expenses. They insist that no other third parties will be impacted by the granting of permanent injunctive relief because they, the trustee, and Tom are the only parties to the trust. They contend that the public interest will be served if an injunction is issued because it will promote confidence that orders entered by courts with proper jurisdiction will be enforced. They cite a number of cases from other jurisdictions restraining litigants from proceeding in suits brought in sister states. They claim that "a duplication of the parties and issues, alone, is generally sufficient to justify the issuance of an antisuit injunction."

{¶ 84} Tom counters that a court should be particularly cautious when considering an injunction that would interfere with the exercise of constitutional rights or interfere with the jurisdiction of another court. He insists that the trust at issue is a Florida trust prepared for a Florida resident that expressly adopts Florida law as controlling. He contends that the use of injunctive relief to prohibit a person from resorting to a foreign

35.

court is a power that must be used sparingly and that this case is not a proper case for the issuance of such an injunction.

{¶ 85} While the trial court acknowledged its authority to restrict a person over whom it has jurisdiction from bringing and maintaining suit in a foreign state for the purpose of, or with the effect of, harassing or oppressing another party, it expressed that enjoining proceedings in another state requires exceptional circumstances not present in this case. The court also recognized:

> The parties to this suit are clearly bound by this decision under the doctrine of *res judicata,* at least until the decision is reversed or modified. The Full Faith and Credit Clause of the U.S. Constitution will require that other states [sic] courts, including Florida, give full faith and credit to rulings of Ohio courts and honor them.

{¶ 86} We review a trial court's order granting or denying injunctive relief for an abuse of discretion. *Try Hours, Inc. v. Douville*, 2013-Ohio-53, 985 N.E.2d 955, ¶ 19 (6th Dist.). We find no abuse of discretion in the court's decision.

{¶ 87} We find the Roans' sixth assignment of error not well-taken. We now turn to Tom's cross-appeal.

36.

## B. Tom's Cross-Appeal

## 1. The Equalization Provision

{¶ 88} In his first assignment of error, Tom claims that the trial court improperly applied the equalization provision of the October 20, 2003 restatement. That provision provides:

> It is Grantor's desire that Grantor's son, THOMAS O. LEVENSON, receive an equal amount of shares in SPANGLER CANDY COMPANY to the amount received by grantor's daughter, ANN R. ROAN. Accordingly, Grantor's Trustee shall first determine the number of shares which have been transferred by the Grantor, either individually or under this Trust, or in any gift giving Trust created during Grantor's lifetime. The Trustee shall determine the amount of shares received by THOMAS O. LEVENSON, either outright or in trust, and received by his former wife's Trust and the sum of these shares shall be known as the "TOM SHARES". The Trustee shall then determine the amount of shares received by Grantor's daughter, ANN R. ROAN, and her husband, STEVEN ROAN, either outright or in trust, and the sum of these shares shall be known as the "ANN SHARES". The Trustee shall then distribute to Grantor's son, THOMAS O. LEVENSON, outright and free of trust, that number of shares equal to the ANN SHARES less TOM SHARES. As of the time of execution of this Agreement, the TOM SHARES equals SIXTEEN THOUSAND EIGHT

37.

HUNDRED SEVENTY FOUR (16,874) and the ANN SHARES equals

TWENTY-ONE THOUSAND EIGHT HUNDRED FIFTEEN (21,815).

Accordingly, if Grantor did not make any more lifetime transfers, then the

amount of shares to be devised to THOMAS O. LEVENSON under this

equalization provision would equal FOUR THOUSAND NINE

HUNDRED FORTY-ONE (4,941) shares.

{¶ 89} Tom urges that under the plain language of this provision, Betty expressed her desire that he and Ann possess an equal number of shares in Spangler Candy, regardless of how those shares were acquired. He claims that by specifying in the provision itself the precise number of shares at issue, Betty was providing a starting point for the eventual calculation of the number of shares that would need to be transferred to Tom. He contends that the terms of the provision are unambiguous and that extrinsic evidence need not be examined in discerning their meaning; however, he emphasizes that the attorney who drafted the provision specifically testified that the numbers were incorporated into the provision for the precise purpose of making clear the starting point for calculations.

{¶ 90} The Roans agree that Betty intended to treat Ann and Tom equally; however, they argue that Betty did not intend for shares they received from other sources to be considered in calculating the number of shares that would need to be transferred to Tom under the equalization provision. The Roans interpret that it was Betty's intention that only shares transferred *from Betty* be considered. They urge that the inclusion in the

38.

provision of the specific numbers of "Tom shares" and "Ann shares" was simply for purposes of illustration. Moreover, they contend that the provision contains incorrect numbers.

{¶ 91} The trial court agreed with the Roans' interpretation of the provision. It held that "shares of stock transferred to the parties by persons other than Betty Strickland shall be disregarded by the Trustee when determining the number of shares of Spangler Candy Company stock which are to be transferred to Thomas Levenson as an equalizing distribution under the terms of this provision."

{¶ 92} "The interpretation of a written instrument presents a question of law which is reviewed *de novo*." *Davis v. Rex*, 876 So.2d 609, 613 (Fla.App.2004). Applying this de novo standard, we find that the plain language of the equalization provision supports Tom's interpretation.

{¶ 93} First, Betty specifically stated that it was her desire that Tom "receive an equal amount of [Spangler Candy] shares * * * to the amount received by * * * Ann." Although the second sentence provides that the trustee "shall first determine the number of shares which have been *transferred by the Grantor*," it goes on to state that the trustee "shall determine the amount of shares *received by* THOMAS O. LEVENSON, either outright or in trust, and received by his former wife's Trust," and next to "determine the amount of shares *received by* Grantor's daughter, ANN R. ROAN, and her husband, STEVEN ROAN, either outright or in trust." (Emphasis added.) The provision does not qualify that the trustee's determination of the number of shares be limited to include only

39.

those shares received *from Betty*. That the trustee was instructed to determine the number of shares "*received by*" Tom, his ex-wife, Ann, and Steven—and not merely to determine the number of shares that Betty *transferred to* them—signals to us that she intended for all Spangler shares to be considered in applying the equalization provision.

{¶ 94} Additionally, the agreement provides the precise number of shares owned by Ann and Tom. It specifies the number of "Tom shares" and "Ann shares" owned as of the execution of the October 20, 2003 agreement, and it specifies how many shares would need to be transferred to Tom if Betty made no further transfers during her lifetime. If Betty intended to provide only an example of how the number of shares should be calculated, it seems to us that she would have used simpler, less specific numbers (e.g., round numbers like 20,000 or 10,000), instead of numbers actually corresponding to the number of shares that had been transferred to the parties.

{¶ 95} To that end, the Roans claim that there is an error with the figures themselves. The October 20, 2003 restatement indicates that the "Ann shares" total 21,815. They concede that if the shares Ann and Steven received from other sources are considered, this figure accurately reflects the number of "Ann shares." However, they claim that at no time did Tom's shares total 16,874. They claim that Tom's shares and those of his ex-wife (i.e., the "Tom shares") totaled 18,482. Tom explained this discrepancy: He testified that Betty transferred to him 1,608 shares after the equalization provision was incorporated into the March 4, 2002 amendment, but before the

40.

October 20, 2003 restatement was executed. Subtracting those 1,608 shares produces the number specified in the October 20, 2003 document.

{¶ 96} With the discrepancy of the figure listed as "Tom shares" in the October 20, 2003 amendment having easily been reconciled, we find that the equalization provision unambiguously provides that Betty intended for shares from all sources to be considered in equalizing the number of "Tom shares" and "Ann shares." We find that the trial court erred in interpreting the equalization provision otherwise.

{¶ 97} We find Tom's first assignment of error well-taken.

## 2. The Statute of Limitations

{¶ 98} In his second assignment of error, Tom argues that the trial court erred in failing to apply the six-month statute of limitations set forth in Fla.Stat. 736.0604 and in denying his request to amend his reply to the Roans' cross-claim to assert the statute of limitations as a defense.

{¶ 99} Fla.Stat. 736.0604 provides:

An action to contest the validity of a trust that was revocable at the settlor's death is barred, if not commenced within the earlier of:

(1) The time as provided in chapter 95; or

(2) Six months after the trustee sent the person a copy of the trust instrument and a notice informing the person of the trust's existence, of the trustee's name and address, and of the time allowed for commencing a proceeding.

41.

{¶ 100} Tom argues that the October 20, 2003 restatement and the Fla.Stat. 736.0813 notice was signed by Newcomer, as trustee, and mailed to the beneficiaries 12 months before Newcomer initiated the present action. He claims that the notice was then filed with the Indian River County probate court in Florida, where the estate was being administered. Thus, Tom maintains, unless waived, any challenge to the validity of the October 20, 2003 restatement was time-barred under Fla.Stat. 736.0604(2). Tom insists that he asserted the statute of limitations as a defense to the action initiated by Newcomer, thus it was not waived. He acknowledges that he failed to assert the defense in his reply to the Roans' cross-claim. He argues, however, that (1) the defense was most properly asserted in response to the original complaint; (2) the parties were on notice that he was asserting the statute of limitations defense, and (3) the trial court improperly denied his Civ.R. 15(A) motion to amend his reply to the cross-claim.

{¶ 101} The Roans respond that Tom not only waived the statute of limitations defense by failing to assert it in his reply to their cross-claim, but also that he failed to timely avail himself of relief under Civ.R. 15(A) because the first time he raised the defense was in response to the Roans' motion for summary judgment. The Roans direct us to *American Diversified Devs. v. Hilti Constr. Chem.*, 8th Dist. Cuyahoga No. 73116, 73168, 1998 WL 767618 (Oct. 29, 1998) as support for their position. They also claim that the notice relied upon by Tom did not trigger the statute of limitations because it did not contain the August 24, 2006 amendment. They insist that the trustee could not activate the statute of limitations without serving notice of the August 24, 2006

42.

amendment along with the October 20, 2003 restatement. And they argue that under Florida's delayed discovery doctrine, the statute of limitations could not have begun to run until they were put on notice of the existence of the 2006 amendment.

{¶ 102} In addition to the foregoing arguments, the Roans urge that Fla.Stat. 736.0604 does not apply where a trustee seeks interpretation of a trust or a declaration from the court as to which documents constitute the trust. They also contend that it does not apply to a beneficiary who is not contesting the validity of the trust. They deny that they are contesting the validity of the trust. They claim that only Tom contests the validity of the trust by challenging Betty's execution of the August 24, 2006 amendment.

{¶ 103} Unfortunately, there are no Florida cases that address Fla.Stat. 736.0604. Under its plain language, however, the statute sets forth a limitations period for actions "*to contest the validity* of a trust." (Emphasis added.) As Newcomer made clear in his complaint for declaratory judgment, his purpose in bringing this action was not to contest the validity of the trust, but to enable him to administer the trust in accordance with the terms of whichever document is declared to be the last valid trust agreement. Accordingly, because the action was not one challenging the validity of the trust, we find that the six-month statute of limitations is inapplicable.

{¶ 104} We acknowledge that the parties asserted counterclaims and cross-claims following Newcomer's initiation of this action, but we are not persuaded that those cross-claims and counterclaims were barred by the six-month limitations period, particularly

43.

where the Fla.Stat. 736.0813 notice provided by Newcomer did not include reference to the August 24, 2006 document.

{¶ 105} We find Tom's second assignment of error not well-taken.

### 3. Betty's Competence

{¶ 106} In his third assignment of error, Tom claims that the trial court erred in directing a verdict on the issue of competency. He claims that between the medical records noting Betty's illogical thinking, the indication in those records that Newcomer spoke to Betty's physician about his concerns about her thought processes, the neuropsychological examination documenting Betty's "confusion," "confabulation," and "memory problems," Newcomer's admission that he was not present for the execution of the August 24, 2006 amendment, and the testimony from the witnesses to Betty's signature that they really had no recollection of Betty's execution of the amendment, the issue was one of fact that should have been submitted to the jury.

{¶ 107} The Roans claim that there is a strong presumption of competency which Tom failed to overcome. They contend that both Ann and Steven testified to Betty's competence on the day in question and they point out that even Tom offered no testimony to contradict their assertions. They also cite to Tom's inconsistent position in arguing that Item One was validly executed, while Item Two was not. And they emphasize that numerous Florida cases indicate that even a demented, intoxicated, feeble-minded, or insane person can validly execute estate planning documents if done during a lucid interval.

44.

{¶ 108} Although the October 20, 2003 trust agreement indicates that the trust is to be administered under the laws of Florida, the August 24, 2006 amendment was executed in Ohio, thus we apply Ohio law in resolving the issue of whether Betty lacked the capacity to execute that amendment. Ohio law provides the following standard to be applied:

> Testamentary capacity exists when the testator has sufficient mind and memory: First, to understand the nature of the business in which he is engaged; second, to comprehend generally the nature and extent of his property; third, to hold in his mind the names and identity of those who have natural claims upon his bounty; fourth, to be able to appreciate his relation to the members of his family. *Niemes v. Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917), paragraph four of the syllabus. *See also Martin v. Dew*, 10th Dist. Franklin No. 03AP-734, 2004-Ohio-2520, ¶ 10.

{¶ 109} Courts apply this standard in considering a settlor's capacity to execute trust documents that form a part of an estate plan. *See, e.g., Lah v. Rogers*, 125 Ohio App.3d 164, 175, 707 N.E.2d 1208 (11th Dist.1998); *Neumeyer v. Estate of Penick*, 180 Ohio App.3d 654, 2009-Ohio-321, 906 N.E.2d 1168, ¶ 47 (5th Dist.). The party seeking to void the agreement due to a lack of capacity has the burden of proof by clear and convincing evidence. *Lah* at 175. "Clear and convincing evidence is that evidence 'which will provide in the mind of the trier of facts a firm belief or conviction as to the

45.

facts sought to be established.'" (Internal citations omitted.) *State v. Garcia*, 126 Ohio App.3d 485, 487, 710 N.E.2d 783 (12th Dist.1998).

{¶ 110} While at first blush it may seem that Tom presented sufficient evidence to create a question of fact as to whether Betty suffered from some degree of cognitive impairment in late August 2006, in fact, he presented no evidence going to the four factors pertinent to testamentary capacity. Dr. Lawrence did not see Betty on August 28, 2006, and she conceded that Betty's confusion could very well have been transient. What is more, Dr. Lawrence described that Betty had trouble reciting back strings of words and numbers, matching pictures of angled lines, and recalling the details of a story read to her. She said nothing of Betty's ability to describe the property in her estate or the family members who may inherit from her. In fact, Dr. Lawrence noted that Betty was oriented (other than believing it was August 27 when, in fact, it was August 29), that her speech was fluent and functional, and that interpersonally, she was cooperative, engaging, cheerful, and unremarkable. We, therefore, find no error in the trial court's decision to grant the Roans' motion for directed verdict as to the issue of Betty's competence to execute the August 24, 2006 amendment. *See Doyle v. Schott*, 65 Ohio App.3d 92, 95, 582 N.E.2d 1057 (1st Dist.1989) (affirming grant of summary judgment where probate court concluded that evidence failed to address any of the four criteria relating to the determination of testamentary capacity).

{¶ 111} We find Tom's third assignment of error not well-taken.

### III. Conclusion

{¶ 112} For the foregoing reasons, we find all of the Roans' assignments of error not well-taken. We find Tom's first assignment of error well-taken, but we find his second and third assignments of error not well-taken. We, therefore, affirm the February 19, 2014 judgment of the Williams County Court of Common Pleas. We reverse its October 8, 2014 judgment as it pertains to application of the equalization provision; we affirm the judgment in all other respects. And we affirm its December 31, 2014 judgment. The costs of this case are assessed to the Roans under App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE

Arlene Singer, J.　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
James D. Jensen, P.J.　　　　　　　　　　　　　　　　　　JUDGE
CONCUR.

　　　　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.